# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA.

## JULY TERM, 1862.

---

F. A. W. DAVIS, Appellant, *vs.* ALLEN PIERSE, WILCOX & BARBER, *et al.*, Respondents.

### APPEAL FROM THE DISTRICT COURT OF RAMSEY COUNTY.

The eighth section of our Bill of Rights, secures to all the people of this State, without exception, the right to maintain and defend actions and other judicial proceedings; and no one, for any cause whatsoever, can legally be deprived of this constitutional right; nor can it be suspended even, so as to prevent his obtaining justice "promptly and without delay."

By *Section 2, Article IV,* of the *Federal Constitution,* every citizen of the United States is entitled to the same privilege and exemption.

The act entitled "An Act suspending the privilege of all persons aiding the rebellion against the United States, of prosecuting and defending actions and judicial proceedings in this State" passed by our State Legislature, and approved February 14th, 1862, so far as it is intended to apply to the people of this State, and to citizens of the United States, is unconstitutional and void.

This cause being at issue in the District Court of Ramsey County upon complaint, answer and reply, the Defendants Wilcox & Barber served a supplemental answer, whereof the following is a copy :

vol vii.—3

The supplemental answer of Carlos Wilcox and Daniel R. Barber, Defendants in the above entitled action, respectfully shows to the Court,—

That said Defendants, upon information and belief, aver that F. A. W. Davis, the Plaintiff in the above entitled action, was, on and prior to the 4th day of February, A. D. 1862, and still is, a resident and citizen of the State of Mississippi, which said State has been and still is in rebellion against the Government of the United States.

Upon filing this answer in the Court below, an order was made and entered staying all proceedings in said cause, except so far as may be necessary for the making and trial of the issue tendered by the supplemental answer.

The Plaintiff demurred to the supplemental answer, which demurrer was overruled in the Court below. The Plaintiff appealed from this order.

Points and Authorities for Appellant.

I.—(As to the Plaintiff's right to demur to the supplemental answer.)

The right to demur is given by statute, (*Stat. of Minn.*, *p.* 540, *sec.* 58.) and cannot be taken away without express legislation, if at all. *Smith's Com. on Const. Con.*, *sec.* 757. Without the statute, the right exists at common law, and as long as courts recognize the science of pleading, the right to demur must exist in some shape or form. 1 *Chit. Pl.*, 661.

II.—The act of the Legislature of this State authorizing supplemental pleadings in certain cases, (*Sess. Laws of* 1862, *p.* 54, 60,) is unconstitutional and void. *Const. of U. S.*, *art.* 4, *sec.* 2; *Const. of U. S.*, *art.* 1, *sec.* 8.

III.—The right to confiscate the property of an enemy, belongs to the Congress of the United States, and not to the Legislature of the several States. 1 *Kent's Com.*, *p.* 67 8, 8*th Edition.*

IV.—The act operates as a legislative conviction of, and punishment for, the crime of treason against the Federal Government, without a trial by jury : in this, that the conviction may be had upon default, and without first bringing the party

Davis v. Pierse et als.

into Court, which is necessary in every criminal proceeding at common law.

V.—Granting the power of a State Legislature to confiscate property, the act does not in fact make a legal confiscation, in this, that the property is not declared to be forfeited for the benefit of the public treasury. *Bouvier's Law Dictionary, of "Confiscation," vol.* 1, *p.* 291.

VI.—The act is directed against persons " who heretofore have been, now are, or hereafter may be, engaged in aiding or abetting the rebellion now existing *against the Government of the United States*," and it does not appear that there is any existing rebellion against the State of Minnesota, and the act does not contemplate such a rebellion. The Courts of the United States have exclusive jurisdiction of crimes against the Federal Government. See *Wharton's Am. Crim. Law, p.* 781 *to* 790, *and cases cited under head of* "*Treason against the Several States.*" *People vs. Lynch,* 11 *John.,* 549; 4 *Am. Law Mag.,* 318, *quoted in Whar. Am. Cr. L., p.* 785, *note t.*

VAN ETTEN & OFFICER, Counsel for Appellant.

D. COOPER, Counsel for Respondents.

*By the Court*—EMMETT, C. J.—As this case is presented to us, the only question necessary to be considered, is as to the constitutionality of an act of our Legislature, passed February 14th, 1862, and entitled "An Act suspending the privilege of all persons aiding the rebellion against the United States, of prosecuting and defending actions and judicial proceedings in this State." We have had the benefit, in this and other cases since heard, of three distinct and elaborate discussions of this question, each time by different and learned counsel,—have taken ample time to consider the various arguments offered, and have endeavored to give to each its due weight. We do not propose however to discuss the several propositions had under consideration, but rather to state the conclusion to which we have arrived, with some of the reasons which led to it.

The act was doubtless intended to be in aid of the General

Government, then and still engaged in efforts to put down a most gigantic and causeless rebellion. It was but natural, at such a time, that every patriotic citizen should feel that any one engaged in this traitorous attempt to dismember the Republic, ought not still to enjoy privileges secured to him only by that government which he has renounced and is striving to subvert; and especially that he should not be permitted, by the aid of our courts, to take of the substance of the people of the loyal states, to be afterwards used by him in support of the rebellion. Hence the Legislature was readily induced to pass an act, which, while it visited those who had already engaged in the rebellion with certain disabilities, might, by the powerful motive of self-interest, restrain others from following their bad example. Still, the very fact that the act was passed under such a state of excitement, admonishes us of the necessity of carefully examining its several provisions, lest in our anxiety to punish the guilty authors and abettors of our national troubles, we do far greater injury to ourselves, by forgetting justice, and disregarding the wholesome restraints of our fundamental law.

If the state of governmental affairs were always peaceful and quiet, and legislation never attended with undue excitement, many of the restrictions imposed by constitutional governments upon legislative power, might be dispensed with as unnecessary; but it is precisely because emergencies will arise, which, for the time, seem to demand or justify a resort to radical and extreme measures, that these various inhibitions are declared in the fundamental law; and as extraordinary acts of legislation are seldom resorted to, except when the public exigencies seem to demand them, it may truly be said that these provisions are inserted in constitutions for the very purpose of meeting this plea of necessity. Hence the greater the seeming necessity, or popular demand for such legislation, the greater the danger to be apprehended from yielding to it, and the more imperative the obligation on the part of the courts to square it rigorously by the constitution —as no act in conflict with that instrument can ever become a law, however just, abstractly considered, its provisions may be; or however great and immediate the apparent necessity for such an enactment.

Now when we recur to our State Constitution we find that the bill.of rights expressly declares that no person shall be held to answer for a criminal offence, unless on the present- ment or indictment of a grand jury, except in cases of im- peachment or in cases cognizable by justices of the peace, or arising in the army or navy, or in the militia when in active service. *Section* 7.

It also declares *every* person to be entitled to a " cer- tain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character," and that he shall obtain justice " promptly and without delay, conform- ably to the laws." *Section* 8.

It also prohibits the Legislature from passing any *ex post facto* law, or any law impairing the obligation of contracts. *Section* 11.

And yet it may be said that the act under consid- eration contravenes each of these provisions or declarations in one form or other. As before remarked, this suspending of the right to maintain or defend an action, or other judicial proceeding, is in the nature of a punishment for rebellion ; and yet this punishment or penalty, by the terms of the act, can be inflicted without presentment, or indictment, or trial such as the Constitution requires. The statute applies in terms as well to acts of rebellion committed before its pas- sage, as to those committed afterwards ; and in respect to the former, it is clearly *ex post facto*. And in so far as it denies a remedy on contracts made with certain persons, or in which such persons are interested, it may be said to impair their ob- ligation, as well as withhold a constitutional privilege. It is admitted that the term " every," as used in connection with the word " person " in said section 8, is not to be taken in its broadest sense, as that would include aliens, enemies as well as friends. It is not to be presumed that it was the intention to throw open our courts to alien enemies, or to extend priv- ileges to alien friends, other than those already accorded by comity among civilized nations. The section was intended for the benefit of, and we think should be limited in its ap- plication to, the people of the State, or at most to such per- sons as are within its limits and subject to its laws ; all others

might be denied the privilege of our courts without depriving them of an absolute right. Even the citizens of other of the United States could not demand this privilege as a right, were it not for a provision of the Constitution of the United States, hereinafter recited. Let us therefore first inquire whether, under any circumstances, or for any cause whatsoever, a citizen of Minnesota can be rightfully deprived of the right thus guaranteed to him by the Constitution of the State, and then as to the citizens of other States.

The section, within the restriction above admitted, applies to all, without exception. "Every person," is the language made use of; and if there was to be an exception it would doubtless have been noticed. And why, it may well be asked, should there be an exception? Why should simple justice, as against another, be denied to any citizen, however fallen, degraded or guilty he may be? The chief end of government is the protection of the rights of all—the bad no less than the good—and, even without a constitutional provision, every member of society may rightfully claim protection of his person and property. To deny it to any one member of society is an injury to community at large, and none the less so though the sufferer may have committed crimes worthy of imprisonment or death.

We would never for one moment suppose that the Legislature has the power under the constitution, to deprive a person or class of persons, of the right of trial by jury, or to subject them to imprisonment for debt, or their persons, houses, papers and effects, to unreasonable searches; or their property to be taken for public use without just compensation; and yet neither of these is more sacred to the citizen, or more carefully guarded by the constitution, than the right to have a certain and prompt remedy in the laws for all injuries or wrongs to person, property or character.

An attempt was made, and supported by an ingenious argument, to weaken the force of this objection by drawing a distinction in regard to the punishments which might be inflicted between ordinary crimes, and those which, like treason and rebellion, strike at the very foundations of the government; but such distinction is not found in the constitution,

Davis v. Pierse et als.

nor do we think any such was ever contemplated. We think that the framers of the constitution intended that there should be no exception to the rule declared in the 8th section of the Bill of Rights, and are of opinion that to admit of one would not only be violative of every principle of justice, but wholly beneath the dignity of a free government. This is a mere question of legislative power under the constitution, and if we once admit that even the rebel or traitor can, in the face of the constitutional provision so often referred to, be deprived of the privilege of suing and defending in our courts, the same consequences may, in the discretion of the legislature, be visited upon criminals of every grade ; for there is no line at which the law making power can be stopped, if once permitted to pass that prescribed by the fundamental law.

But, it is urged, this act does not take away this privilege entirely ; it only *suspends* it during the continuance of the rebellion. The Legislature itself seems to have been fully aware of the want of power wholly to deprive the rebel of a right guaranteed to him by the State Constitution, and hence the attempt to accomplish by indirection, that which could not be done directly. The course it was found necessary to pursue in framing this act in order to effect the object, is of itself such an admission of a want of power to take away the privilege, that we should not have thought it necessary to discuss the question, had it not been urged on the argument, with apparent seriousness, that the legislature has this power in certain cases.

Now, aside from the fact that the suspension, even of this privilege, for any length of time, might be considered wholly inconsistent with the right to have justice "promptly and without delay," we hold, in any event, that the suspending of the right for so indefinite a period as "during the continuance of said rebellion," is equivalent to denying it altogether. Had the right to sue merely been suspended until the party returned to his allegiance, it might have been claimed with a semblance of reason, that, although the time was indefinite, yet as it was in his power to make it definite, and to reinstate himself in the full enjoyment of his privilege at any time, by

his own act alone, a party was in no wise injured thereby. But to suspend, as this act does, not only the right to maintain an action, by any one engaged in the rebellion, but even his right to defend, when brought into our courts by others, until those, who are or may be controlling the rebellion, and over whom he may not possess a particle of influence, shall cease their efforts to overthrow the government, is so indefinite and uncertain, as to be altogether indefensible in any view which we have been able to take of the subject. Nor can we adopt the suggestion repeatedly urged, that this statute might be treated as merely imposing terms upon litigation ; because whenever terms are admissible they must be reasonable, and not inconsistent with the free and prompt administration of justice ; but here, as we have seen, it is put utterly without the power of the party to reinstate himself in his privilege, except upon the terms of putting a stop to a rebellion in which millions of people are involved.

We are clearly of opinion therefore, that so far at least as the citizen of this State is concerned, the act cannot apply, because the legislature cannot, directly or indirectly, for any cause whatsoever, deprive him of his constitutional right to commence, maintain or defend any action or other judicial proceeding.

Here, however, another question is presented. Cannot the statute be made to apply to those who are citizens of other States ? The Constitution of the United States seems to settle this question at once. Section 2, Art. IV, declares that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." We have endeavored to show that the citizens of this State are not affected by this act, and it seems to follow necessarily from the clause just recited that the citizens of the other States are equally exempt.

We do not hold that this clause authorizes every one, whom either of the States may recognize as a citizen, or may elevate to State citizenship, to demand in every State of the Union, all the privileges and immunities accorded to any of its citizens. Thus construed, the negro citizen of Massachusetts, after residing in this State four months, might insist on the

Davis v. Pierse et als.

right to vote, although we do not extend that privilege to our own negroes:—on the other hand by conferring citizenship on our savage Indians, we might supply other States with another class whom ·they would be bound to admit to all the privileges which their own citizens of whatever class enjoy. In this way the naturalization laws passed by Congress would be completely nullified; for the citizens of each State would become in effect, citizens of the United States; and the lowest standard of citizenship which any State might adopt, would, so far as her citizens were concerned, be substituted for that prescribed by Congress.   The clause will not, in our opinion, admit of any such construction.   Properly interpreted we are by no means sure that the word " citizens," as therein used, means other than citizens of the United States.   The main object of the section was to prevent each State from discriminating in favor of its own people, or against those of any other, by securing to each citizen of the government then being formed, (and to none other as we believe) certain fundamental rights, privileges and immunities, wheresoever in the United States he might demand them, and to which individual State soever he might belong.   Not absolute equality of rights and privileges with every citizen of each State of the Union, but all such privileges and immunities in any State as are, by the constitution and laws thereof, secured, or extended to her own people. of the same class, and otherwise similarly situated.   Such an interpretation would, it is confidently believed, furnish an easy and satisfactory solution of many troublesome questions—would afford all the protection needed by the people, and secure every other end sought to be accomplished by the section.   But however liberal or confined the interpretation and construction may be, there can. no longer be any doubt that it covers the present case; for it has already been decided that among the privileges in which the citizen of every State is secured by this section, that of instituting and maintaining actions of every kind in the courts of every other State is included.   *Corfield vs. Coryell*, 4 *W. C. C.*, 380-81.

There appears to be but one way in which this act can be made to apply to citizens of other States, and that is to hold,

and treat them as alien enemies.   But this view cannot for one moment be tolerated, because it involves either an admission of the right of a State to secede from the Union, or that the rebellion has become a revolution.   So long as the Government of the Union treats the revolt of certain States as a rebellion, and continues its efforts to reinstate the Federal authority, we must treat their several ordinances of secession as nullities merely, and recognize and respect every right and privilege which the people of those States may have as citizens of the United States.   While the Government is striving to maintain the supremacy of the Constitution, it becomes every loyal State to acknowledge and respond to every obligation which that instrument imposes.   We cannot therefore consistently treat every attempt of a State to withdraw from the Union, as of no validity whatever, and at the same time hold the citizens thereof in any degree accountable for the action of their State.   Unless they are absolutely shielded from the consequences of their rebellion, by State action, they should in no wise be prejudiced thereby.   And yet while the Federal Government treats as wholly unauthorized and void, the so-called secession ordinances of every State, and repudiates every defense of individual action founded thereon, while it still regards the people of those States as citizens, and asserts the right to punish their revolt as rebellion ; the enactment before us affects to treat them as alien enemies, for the purpose of depriving them of rights which they enjoy as citizens of the United States, and to that end draws distinctions to their prejudice, between them and the citizens of other States, founded solely on the action of their State.

The number of instances in which, of late years, statutes have been declared unconstitutional, is sometimes referred to as if the fact were to be regretted ; but this proves nothing, (unless the decisions are shown to be wrong,) except perhaps that legislation is not so carefully conducted as formerly.   It sometimes happens, we fear, that legislators resolve all doubts in favor of enactments, which seem to be demanded by the occasion, or by the current of popular sentiment, relying upon the courts to apply a remedy, if it should be found on more careful examination that the Legislature had no authority to

pass such a law. This fact serves to explain to some extent why questions touching the constitutionality of statutes are more frequent of late than in former years. But however often such questions are presented, it is the duty of the courts to meet and decide them ; and let us hope that all encroachments upon the fundamental laws of the State and nation may ever be faithfully and successfully resisted.

We have not a doubt of the unconstitutionality of this act, so far as it is intended to be applied to the people of this State or to the citizens of the other States; and although many patriotic citizens may regret for the moment, that the State and Federal Constitutions stand in the way of an enactment which might aid, however feebly, in restoring the supremacy of the Union ; yet in the end all must regard as matter of pride and gratulation, that in this State no one, not even the worst of felons, can be denied the right to simple justice.

The order overruling the demurrer is reversed, and the supplemental answer and all subsequent proceedings founded thereon, are set aside.