STATE OF MINNESOTA

IN SUPREME COURT

A12-0599

Court of Appeals                                                   Anderson, J.
                                                    Dissenting, Gildea, C.J.
                                                       Dissenting, Page, J.
                                        Dissenting, Lillehaug, and Page, JJ.

State of Minnesota,

     Respondent/Cross-Appellant,

vs.                                                       Filed:  August 19, 2015
                                                    Office of Appellate Courts
Bonnie Ann Lindquist,

     Appellant/Cross-Respondent.

————————————————

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

James P. Ratz, Aitkin County Attorney, Nicholas B. Wanka, Assistant County Attorney, Aitkin, Minnesota, for respondent/cross-appellant.

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, Saint Paul, Minnesota, for appellant/cross-respondent.

————————————————

S Y L L A B U S

1.     A criminal defendant does not forfeit the right to bring a constitutional challenge not asserted at the district court when a Supreme Court decision creates an intervening change in the law and the defendant's argument would have otherwise been futile prior to the intervening decision.

1

2. The exclusionary rule does not apply to violations of the Fourth Amendment to the U.S. Constitution, or Article I, Section 10, of the Minnesota Constitution, when law enforcement acts in good-faith, objectively reasonable reliance on binding appellate precedent.

Affirmed.

O P I N I O N

ANDERSON, Justice.

The question presented by this case is whether the good-faith exception to the exclusionary rule articulated in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), should apply in Minnesota. Appellant/cross-respondent Bonnie Ann Lindquist was convicted of third-degree driving while impaired (DWI). At trial, the district court admitted test results showing Lindquist's alcohol concentration that were based on a warrantless blood draw. While Lindquist's case was on direct appeal, the Supreme Court decided *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013), which held that the dissipation of alcohol in the blood does not create a single-factor exigency justifying a warrantless blood draw of suspected drunk drivers. Lindquist now challenges her blood draw as unconstitutional under *McNeely*. Although we hold that *McNeely* applies to cases on direct review at the time of decision, we also hold that the test results from Lindquist's warrantless blood draw, even if unconstitutionally obtained, do not need to be suppressed because the officer who facilitated the blood draw acted in objectively reasonable reliance on binding appellate precedent. We therefore affirm the conviction.

On February 19, 2011, officers responded to a single-vehicle accident on a rural road in Aitkin County. A witness told the officers that one of the passengers sustained a head injury and that the occupants of the vehicle had fled. One officer learned that the vehicle involved in the accident belonged to Lindquist and her husband. Two officers drove to the Lindquist residence and entered the home to locate the injured passenger. They found the Lindquists hiding in a closet. Lindquist's husband, who initially claimed to be the driver, had facial bleeding but declined medical attention. The officers later determined that Lindquist, not her husband, was the driver.

The officers observed that Lindquist had slurred speech, an unsteady gait, and red eyes. She also failed field sobriety tests. After declining a preliminary breath test, Lindquist was placed under arrest and transported to a hospital for a blood draw. The officer who facilitated the blood draw did not read the Minnesota implied consent advisory, *see* Minn. Stat. § 169A.51, subd. 2(a)-(b) (2014), and sought neither consent nor a warrant for the blood draw. He testified that it was "procedure" at the time to "go straight to the blood" when responding to an accident involving injury. Lindquist's alcohol concentration was measured at .23 approximately 2 hours after driving.

Respondent State of Minnesota charged Lindquist with two counts of criminal vehicular operation, Minn. Stat. § 609.21, subd. 1(3)-(4), subd. 1a(d) (2012);[1] and two counts of third-degree DWI, Minn. Stat. §§ 169A.20, subd. 1(1), 1(5), 169A.26 (2014).

---

[1] The offense of criminal vehicle operation causing bodily harm has been subsequently renumbered section 609.2113. Act of Apr. 30, 2014, ch. 180, § 9, 2014 Minn. Laws 281, 288 (codified at Minn. Stat. § 609.2113 (2014)).

3

Lindquist did not move to suppress the blood sample or the results of the alcohol-concentration test before the trial. A jury acquitted Lindquist of the criminal-vehicular-operation counts but found her guilty of both counts of third-degree DWI. Lindquist appealed, arguing insufficiency of the evidence, and the court of appeals affirmed. *State v. Lindquist*, No. A12-0599, 2013 WL 1392437, at *2-3 (Minn. App. Apr. 8, 2013), *vacated and remanded*, No. A12-0599, Order at 2-3 (Minn. filed Nov. 26, 2013).

Nine days after the release of the court of appeals opinion, the Supreme Court decided *McNeely*. Lindquist petitioned for review to determine whether, in light of *McNeely*, her blood draw was an unconstitutional search. We stayed proceedings pending final disposition in *State v. Brooks*, 838 N.W.2d 563 (Minn. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1799 (2014). After deciding *Brooks*, we vacated the court of appeals' decision and remanded for further proceedings in light of *McNeely* and *Brooks*.

On remand, the court of appeals again affirmed. *State v. Lindquist*, No. A12-0599, 2014 WL 996470, at *3 (Minn. App. Mar. 17, 2014). The court declined to consider Lindquist's constitutional argument because she did not raise it in the district court or in her first appeal prior to our remand. *Id.* at *2. The State also urged the court of appeals to adopt the federal good-faith exception to the exclusionary rule articulated by the Supreme Court in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), but the court declined to do so. *Lindquist*, 2014 WL 996470, at *2. We granted Lindquist's petition for review of (1) whether she forfeited her constitutional challenge based on *McNeely* by not raising the issue in the district court, and (2) whether the warrantless

4

blood draw was constitutional under *McNeely*. We also granted review of the State's request to adopt the good-faith exception articulated in *Davis*.

I.

First, we must determine whether Lindquist may properly assert a challenge based on *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013), which is a legal question that we review de novo. *State v. Houston*, 702 N.W.2d 268, 270 (Minn. 2005). In *McNeely*, the Supreme Court held that the rapid dissipation of alcohol in the body did not, by itself, establish that there were exigent circumstances justifying a warrantless blood draw from a suspected drunk driver. ___ U.S. at ___, 133 S. Ct. at 1556. Instead, the Court recognized that exigent circumstances, based in part on the rapid dissipation of alcohol in a suspect's body, may allow police to obtain a blood sample without a warrant, but that courts must determine whether an exigency exists based on the totality of the circumstances in each case. *Id.* at ___, 133 S. Ct. at 1565-66. *McNeely* overruled our precedent holding that the rapid dissipation of alcohol in the body creates a single-factor exigency that supports a warrantless search of a suspected drunk driver. *See State v. Netland*, 762 N.W.2d 202, 212-14 (Minn. 2009), *abrogated in part by McNeely*, ___ U.S. ___, 133 S. Ct. 1552; *State v. Shriner*, 751 N.W.2d 538, 545 (Minn. 2008), *abrogated by McNeely*, ___ U.S. ___, 133 S. Ct. 1552.

Although the State acknowledges that *McNeely* applies to this case because Lindquist's direct appeal was pending when *McNeely* was decided, it argues that Lindquist forfeited her *McNeely* challenge by not raising it in a motion to suppress at the district court. "As a general rule, district court errors—even those affecting constitutional

5

rights—can be forfeited for purposes of appeal by the failure to make a timely objection in the district court." *State v. Osborne*, 715 N.W.2d 436, 441 (Minn. 2006). Strict application of the forfeiture rule, however, can result in criminal defendants being unable to benefit from a new rule of constitutional criminal procedure because defendants cannot predict changes in the law and often have little incentive to contest settled rules of law that have not been decided in favor of defendants in the past. *See id.* at 442.

We examined the effect of forfeiture on a new rule of constitutional criminal procedure in *Osborne*. After conviction of 28 drug-related offenses, Osborne was given an upward-durational sentencing departure. *Id.* at 439. Although Osborne argued against the upward departure, he did not argue that the imposed sentence was unconstitutional. *See id.* While Osborne's case was on direct appeal, the Supreme Court decided *Blakely v. Washington*, 542 U.S. 296 (2004), which held that facts, other than a prior conviction, used to enhance a sentence beyond the statutory maximum must be decided by a jury beyond a reasonable doubt or admitted by the defendant. *Osborne*, 715 N.W.2d at 440. We rejected the State's argument that Osborne forfeited a constitutional challenge to his sentence based on *Blakely* because previously we had "consistently rejected any *Blakely*-type claim," and a criminal defendant should not bear the risk of "failing to raise a new principle of law, then unknown to the parties and contrary to the well-established precedent of this court." *Id.* at 442; *see also id.* (noting that a contrary result would "expect defendants to continue, formalistically, to make motions or objections based on arguments that we have repeatedly rejected as being without legal merit").

6

Like *Blakely*, *McNeely* is a new rule of constitutional criminal procedure that overruled our well-established precedent. As in *Osborne*, Lindquist's case was on direct appeal when *McNeely* was announced, and the district court would have summarily rejected a suppression challenge to the warrantless blood draw under *Netland* and *Shriner*. Many—likely most and perhaps nearly all—defendants in Lindquist's position will fail to bring a constitutional claim, either because similar claims have consistently been rejected in other cases, or because of the novelty of the new rule of law.

The State urges us to limit *Osborne* to *Blakely*-type challenges because a defendant must personally and affirmatively waive the right to a jury trial, *see Osborne*, 715 N.W.2d at 442-43, whereas a defendant may forfeit a constitutional challenge to evidence through silence. But, our recent decisions demonstrate that the *Osborne* forfeiture exception is not so narrow. In *State v. Ali*, 855 N.W.2d 235, 253 (Minn. 2014), we permitted a juvenile to challenge his sentence based on *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012), which was decided while Ali's case was on direct review. Ali based his challenge on the Eighth Amendment prohibition on cruel and unusual punishment, and so it did not involve a right that had to be personally waived by the defendant. *Ali*, 855 N.W.2d at 252-53. Citing *Osborne*, we concluded that *Miller* applied. *Id.* at 253; *see also State v. Beaulieu*, 859 N.W.2d 275, 281 n.5 (Minn. 2015) (stating that the *Osborne* forfeiture exception applies when "an intervening change in the law excuse[s] the defendant's failure to assert what would have otherwise been a futile objection in the district court.").

We hold that Lindquist did not forfeit her right to challenge her warrantless blood draw because the Supreme Court's decision in *McNeely* was an intervening change in the law that excused Lindquist's failure to bring what would have otherwise been a futile argument in the district court and court of appeals.

## II.

We next consider whether to adopt the good-faith exception to the exclusionary rule articulated in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011).[2] We begin by examining the history of the exclusionary rule, as applied to the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution, both of which prohibit unreasonable searches and seizures.

## A.

The exclusionary rule to the Fourth Amendment "is a prudential doctrine . . . created by [the Supreme] Court to compel respect for the constitutional guaranty." *Davis*, ___ U.S. at ___, 131 S. Ct. at 2426 (citations omitted); *see also United States v. Calandra*, 414 U.S. 338, 348 (1974) (stating that the exclusionary "rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."). It was first recognized as a remedy for Fourth Amendment violations in *Weeks v. United States*, 232 U.S. 383, 392 (1914), and was applied to the states through the Fourteenth

---

[2] In his dissent, Justice Page suggests that we attempt to sidestep *McNeely* by adopting *Davis*. We simply note that both opinions were issued by the United States Supreme Court and neither has been overruled.

8

Amendment in *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Although *Mapp* proclaims that "all evidence obtained by searches and seizures in violation of the Constitution is . . . inadmissible in a state court," 367 U.S. at 655, the Supreme Court has consistently restricted application of the exclusionary rule to "those areas where its remedial objectives are thought most efficaciously served." *Calandra*, 414 U.S. at 348; *see also Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence . . . has always been our last resort, not our first impulse.").[3]

In particular, the Supreme Court has declined to apply the Fourth Amendment exclusionary rule in circumstances in which doing so would not serve the central purpose of deterring police misconduct. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) ("The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter— to compel respect for the constitutional guaranty in the only effectively available way— by removing the incentive to disregard it."); *see also Arizona v. Evans*, 514 U.S. 1, 14 (1995) ("[T]he exclusionary rule was historically designed as a means of deterring police misconduct . . . ."). Although the Court has noted other purposes of the exclusionary rule, deterring police misconduct has become its touchstone. *Compare Elkins*, 364 U.S. at 217-18, 222-23 (examining the exclusionary rule's role in deterring police misconduct

---

[3] The Supreme Court has held that exclusion is inappropriate in a variety of circumstances, notwithstanding a Fourth Amendment violation. *See, e.g.*, *Stone v. Powell*, 428 U.S. 465, 494 (1976) (habeas proceedings); *United States v. Janis*, 428 U.S. 433, 459-60 (1976) (ordinary civil suits and civil tax proceedings); *Calandra*, 414 U.S. at 354 (grand-jury proceedings); *Walder v. United States*, 347 U.S. 62, 65 (1954) (evidence used to impeach a criminal defendant's direct testimony).

9

and maintaining judicial integrity), *with Davis*, ___ U.S. at ___, 131 S. Ct. at 2432 ("[W]e have said time and again that the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement."), *and United States v. Peltier*, 422 U.S. 531, 536 (1975) ("Decisions of this Court applying the exclusionary rule to unconstitutionally seized evidence have referred to 'the imperative of judicial integrity,' although the Court has relied principally upon the deterrent purpose served by the exclusionary rule." (citation omitted)).

Over the past 3 decades, the Supreme Court has limited the applicability of the exclusionary rule to the Fourth Amendment through a series of good-faith exceptions.  In *United States v. Leon*, 468 U.S. 897 (1984), the Court examined whether the exclusionary rule applies when police conduct a search in reasonable reliance on a facially valid warrant that is later determined to lack probable cause.  The Court noted that the "substantial social costs" of excluding incriminating evidence outweighed the exclusionary rule's benefit "when law enforcement officers have acted in objective good faith or their transgressions have been minor."  *Id.* at 907-08.  Application of the exclusionary rule is therefore unwarranted when exclusion "does not result in appreciable deterrence."  *Id.* at 909 (citation omitted).  Subsequent cases have extended the *Leon* good-faith exception to reasonable reliance on statutes later found unconstitutional, *see Illinois v. Krull*, 480 U.S. 340 (1987), and reasonable reliance on an arrest warrant database, *see Herring v. United States*, 555 U.S. 135 (2009) (database managed by the police); *Evans*, 514 U.S. 1 (database managed by the judiciary).

The most recent good-faith exception, and the one the State urges us to adopt, was articulated in *Davis*, ___ U.S. ___, 131 S. Ct. 2419. In April 2007, police arrested Davis, handcuffed him, and placed him in a squad car. *Id.* at ___, 131 S. Ct. at 2425. Police then searched the passenger compartment of the vehicle Davis had occupied before the arrest, where they found a revolver. *Id.* at ___, 131 S. Ct. at 2425. At the time, the car search was lawful under binding precedent. *Id.* at ___, 131 S. Ct. at 2426. While Davis's case was on direct appeal, the Supreme Court decided *Arizona v. Gant*, 556 U.S. 332 (2009), which applied to Davis's case and rendered the search unconstitutional. *Davis*, ___ U.S. at ___, 131 S. Ct. at 2426.

The Court nevertheless held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at ___, 131 S. Ct. at 2429. Suppressing the evidence would have no deterrent effect on police misconduct because "[t]he police acted in strict compliance with binding precedent." *Id.* at ___, 131 S. Ct. at 2428; *see also id.* at ___, 131 S. Ct. at 2429 ("About all that exclusion would deter in this case is conscientious police work."). The Court limited the exception to circumstances in which "binding appellate precedent specifically *authorizes* a particular police practice," and police "scrupulously adhered to governing law." *Id.* at ___, 131 S. Ct. at 2429, 2434. Police efforts that are otherwise valid should not be rejected as a result of appellate judge error. *Id.* at ___, 131 S. Ct. at 2429.

B.

We have not previously addressed whether to adopt any good-faith exception to the exclusionary rule for evidence obtained in violation of a defendant's constitutional

11

rights against unreasonable searches and seizures.[4] In other contexts, however, we have addressed the exclusionary rule or refused to exclude evidence that was obtained in violation of statutes. These cases establish that the *Davis* good-faith exception is consistent with our prior application of the exclusionary rule.

In *State v. Nolting*, 312 Minn. 449, 456, 254 N.W.2d 340, 344-45 (1977), we concluded that a search warrant for a package was supported by probable cause despite the fact that the affidavit in support of the warrant contained a material misstatement of fact told by a mail clerk to a police officer. We relied on the fact that "the officer procured a warrant from a judicial officer before searching the package" in determining that there was probable case. *Id.* at 456, 254 N.W.2d at 345. In so doing, we noted that "[t]he securing of a warrant may tip the scales" in a case in which probable cause is

---

[4] The State has urged us to adopt the *Leon* good-faith exception in search and seizure cases on several occasions, but we have declined to reach the issue. In several cases, we determined that no Fourth Amendment violation had occurred and therefore the exception was inapplicable. *See State v. Wasson*, 615 N.W.2d 316, 321 (Minn. 2000); *State v. Harris*, 589 N.W.2d 782, 791 n.1 (Minn. 1999); *State v. Lindsey*, 473 N.W.2d 857, 864 n.4 (Minn. 1991); *State v. McCloskey*, 453 N.W.2d 700, 701 n.1 (Minn. 1990); *State v. Wiley*, 366 N.W.2d 265, 269 n.2 (Minn. 1985); *see also State v. Bourke*, 718 N.W.2d 922, 929 n.7 (Minn. 2006) (resolving the issue on statutory grounds and declining to consider the good-faith exception articulated in *Hudson v. Michigan*, 547 U.S. 586 (2006)). We also declined to address the *Leon* good-faith exception in two cases because, regardless of the officers' good faith, the warrant application clearly lacked probable cause and therefore violated Article I, Section 10, of the Minnesota Constitution. *See Garza v. State*, 632 N.W.2d 633, 639-40 (Minn. 2001); *State v. Zanter*, 535 N.W.2d 624, 634 (Minn. 1995); *see also Leon*, 468 U.S. at 921 (explaining that evidence obtained in reliance on a search warrant must still be suppressed under the exclusionary rule if the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or if the warrant was "facially deficient" (citation omitted)).

questionable. *Id.* at 456 n.7, 254 N.W.2d at 345 n.7. We explained that one reason for this principle

> may lie in the characterization of the exclusionary rule as being directed at *police* misconduct. Little more can be expected of a police officer who gathers evidence, presents it to a magistrate, and receives a warrant. If Fourth Amendment rights are violated by the resulting search, the fault lies in large part with the judiciary since refusal to issue the warrant presumably would compel the officer to gather more evidence before a search was conducted. In the present case such evidence was apparently available. Because judges may disagree about the existence of probable cause, it is difficult to fault an officer in close cases for not realizing that his investigation has not yet yielded probable cause.

*Id.* at 456 n.7, 254 N.W.2d at 345 n.7 (citations omitted).

The following term, we applied a good-faith exception and refused to exclude evidence obtained during a search when the warrant authorizing the search violated a statute regarding nighttime searches. *See State v. Lien*, 265 N.W.2d 833, 841 (Minn. 1978), *overruled on other grounds by Richards v. Wisconsin*, 520 U.S. 385 (1997). We declined to suppress the evidence uncovered by the search because "it is clear that the police acted in good faith and that any error committed is attributable to the magistrate." *Id.* at 840. Although the case was decided on statutory rather than constitutional grounds, we noted that "[u]nder these circumstances, one may question whether the exclusionary rule should apply even if the violation were deemed of constitutional proportions." *Id.*

Next, in *State v. Wiberg*, 296 N.W.2d 388, 392-93 (Minn. 1980), we addressed whether a defendant's statement made 2 days after her arrest should be suppressed because of a violation of Minn. R. Crim. P. 4.02, subd. 5(1), regarding a prompt arraignment. We refused to apply a federal rule that "automatically exclude[s] statements

13

made which have a reasonable relationship to the unnecessary delay before arraignment." *Wiberg*, 296 N.W.2d at 393. We did so because "[a]pplication of the exclusionary rule exacts a great cost on societal interests by the proscription, in many cases, of concededly relevant and reliable evidence." *Id.* That cost "must be balanced" against "the deterrence of improper police action that the exclusionary rule promotes." *Id.*

Finally, in *Johnson v. State*, we rejected a defendant's ineffective-assistance-of-counsel claim that was based on his trial counsel's failure to challenge DNA evidence that was obtained pursuant to an erroneous court order. 673 N.W.2d 144, 148-51 (Minn. 2004). We concluded that the defendant could not show prejudice because the exclusionary rule would not have applied to this DNA evidence, which was obtained because of a court's improper interpretation of a statute. *Id.* at 150. Thus, "the goal of preventing police misconduct would [not] be served by suppression of the evidence." *Id.*; *see also Brooks*, 838 N.W.2d at 574-76 (Stras, J., concurring) (advocating adoption of the *Davis* good-faith exception in a DWI case because "the deterrence benefits of excluding the test results from the . . . evidence in this case are essentially zero"); *State v. Jackson*, 742 N.W.2d 163, 183-84 (Minn. 2007) (Anderson, G. Barry, J., dissenting) ("[T]here is rarely a significant deterrent effect when an officer acts in good faith within the scope of a warrant . . . ." (citing *Leon*, 468 U.S. at 920-21)).

These cases inform our decision today. Like the Supreme Court, we have identified deterrence of police misconduct as the central purpose of the exclusionary rule. *See, e.g.*, *State v. Hardy*, 577 N.W.2d 212, 217 (Minn. 1998) ("[T]he primary purpose of the exclusionary rule is to deter police misconduct."); *State v. Doughty*, 472 N.W.2d 299,

307 (Minn. 1991). We have refused to suppress evidence in circumstances in which the police have acted in good-faith reliance on a judicial determination or when suppression would not deter police misconduct.

We agree with the Supreme Court that applying the exclusionary rule to evidence obtained during a search conducted in reasonable reliance on binding appellate precedent would have no deterrent value on police misconduct. *Davis*, ___ U.S. at ___, 131 S. Ct. at 2429 ("About all that exclusion would deter in this case is conscientious police work."). When the law changes after a search such that the search now violates the Fourth Amendment to the U.S. Constitution or Article I, Section 10 of the Minnesota Constitution, any error rests with judges and not the police. "Excluding evidence in such cases deters no police misconduct and imposes substantial social costs." *Davis*, ___ U.S. at ___, 131 S. Ct. at 2434.

### III.

We next turn to the arguments Lindquist makes for not adopting the *Davis* good-faith exception to the exclusionary rule for evidence obtained from an unreasonable search or seizure.

### A.

Lindquist first notes that this court has occasionally provided greater protection against unreasonable searches and seizures under Article I, Section 10, of the Minnesota Constitution than is provided by the Fourth Amendment. *See, e.g.*, *State v. Carter*, 697 N.W.2d 199, 202 (Minn. 2005) (dog sniff of storage unit is a search); *In re Welfare of B.R.K.*, 658 N.W.2d 565, 578 (Minn. 2003) (short-term social guests have a legitimate

15

expectation of privacy); *see also Ascher v. Comm'r of Pub. Safety*, 519 N.W.2d 183, 187 (Minn. 1994) (sobriety-checkpoint roadblock constitutes an unreasonable seizure absent an "objective individualized articulable suspicion of criminal wrongdoing"); *In re Welfare of E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993) (seizure occurs when a reasonable person would not feel free to leave). In a similar fashion, Lindquist contends we should provide greater protection under the Minnesota Constitution here and not adopt any good-faith exceptions to the exclusionary rule.

These cases, however, dealt with determining whether a constitutional *violation* occurred. The issue here, by contrast, is the appropriate *remedy*, which is a "separate, analytically distinct issue" from whether a constitutional violation occurred. *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2430-31. Thus, our jurisprudence regarding whether to afford greater protection under a provision in the Minnesota Constitution than is provided by its federal counterpart is not applicable.

Moreover, even if this jurisprudence were applicable, we have held that when a federal constitutional provision has the same or substantially similar language as a corresponding provision in the Minnesota Constitution and the United States Supreme Court has interpreted that language, we will not construe the Minnesota Constitution as granting greater protection for individual rights "unless there is a principled basis to do so." *Kahn v. Griffin*, 701 N.W.2d 815, 824 (Minn. 2005). We see no principled basis to do so when we have made clear that the exclusionary rule in Minnesota, like the federal exclusionary rule, does not require automatic suppression of evidence obtained by unlawful means. *See Wiberg*, 296 N.W.2d at 393 (rejecting automatic suppression of a

16

defendant's statement obtained in violation of Minn. R. Crim. P. 4.02); *see also Johnson*, 673 N.W.2d at 149 (stating that the exclusionary rule "need not be applied rigidly to every situation"). Thus, this is not a situation in which greater protection is warranted under the Minnesota exclusionary rule.

B.

Relying largely on the *Davis* dissent, Lindquist next argues that the *Davis* good-faith exception is incompatible with the Supreme Court's holding in *Griffith v. Kentucky*, 479 U.S. 314 (1987). *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2436-37 (Breyer, J., dissenting). In *Griffith*, the Court held that a new rule of constitutional criminal procedure applies to all cases pending on direct review or not final at the time the rule is announced. 479 U.S. at 328. The *Davis* dissent asserted that the good-faith exception "creates a categorical bar to obtaining redress in *every* case pending when a precedent is overturned," leaving defendants "with a right but not a remedy." *Davis*, ___ U.S. at ___, 131 S. Ct. at 2437 (Breyer, J., dissenting) (citation omitted). According to Lindquist, the *Davis* good-faith exception disallows use of the exclusionary rule in the very cases *Griffith* was intended to reach, resulting in similarly situated defendants being treated in different ways depending on the date of the unconstitutional search. *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2437-38 (Breyer, J., dissenting).

As the Supreme Court explained in *Davis*, however, this argument ignores the fact that the "[r]emedy" for a constitutional violation "is a separate, analytically distinct issue" from whether a constitutional right applies. *Davis*, ___ U.S. at ___, 131 S. Ct. at 2431. First, a court must determine whether a new rule of constitutional criminal

17

procedure "is available on direct review as a *potential* ground for relief." *Id.* at ___, 131 S. Ct. at 2430. But it does not necessarily follow that because a defendant is entitled to a constitutional right, that defendant is also entitled to a certain remedy. *See id.* at ___, 131 S. Ct. at 2431.

Our case law supports this proposition. We have stated that if a rule of constitutional criminal procedure "is considered 'new,' it must be applied to all cases pending on direct review." *State v. Houston*, 702 N.W.2d 268, 270 (Minn. 2005); *see, e.g.*, *State v. Dettman*, 719 N.W.2d 644, 648 (Minn. 2006) (stating "the substantive rule of *Blakely* applies" because the defendant's direct appeal was pending at the time *Blakely* was decided). We have never stated, however, that a certain *remedy* applies as a matter of right when a new rule of constitutional criminal procedure has been announced.

Moreover, the *Davis* good-faith exception affects only a small subset of the cases reached by *Griffith*. The *Davis* exception applies only to new Fourth Amendment rules, leaving *Griffith*'s application to other constitutional rights unaffected. Another limiting factor is that the exception applies only when a case overrules binding appellate precedent that previously worked in the State's favor. *See State v. Dearborn*, 786 N.W.2d 97, 109-10 (Wis. 2010) ("The only litigants who will be disincentivized are the relatively small number of defendants who choose to challenge searches that have already clearly and unequivocally been held lawful."). Thus, the *Davis* good-faith exception has limited application.

C.

Lindquist next argues that the exclusionary rule is a protected remedy under Article I, Section 8, of the Minnesota Constitution. The Remedies Clause provides: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws." Minn. Const. art. I, § 8. The right to a remedy for wrongs is "[a] fundamental concept of our legal system and a right guaranteed by our state constitution." *Anderson v. Stream*, 295 N.W.2d 595, 600 (Minn. 1980).

The Remedies Clause "relates primarily to the assertion of affirmative rights." *Peters v. City of Duluth*, 119 Minn. 96, 105, 137 N.W. 390, 394 (1912). Although some of our early cases suggest an expansive reading of the Remedies Clause, *see, e.g.*, *Davis v. Pierse*, 7 Minn. 13, 18 (Gil. 1, 6) (1862), we have subsequently held that the Remedies Clause "does not guarantee redress for every wrong, but instead enjoins the [government] from eliminating those remedies that have *vested at common law*." *Olson v. Ford Motor Co.*, 558 N.W.2d 491, 497 (Minn. 1997) (citing *Hickman v. Grp. Health Plan, Inc.*, 396 N.W.2d 10, 14 (Minn. 1986)).[5] We normally interpret the Remedies Clause as

---

[5] In his dissent, Justice Page asserts that our single reference to *Olson* and *Hickman* "grossly overstates the[ir] impact." These cases merely support our conclusion that the Remedies Clause is more limited than Justice Page contends. Indeed, Justice Page may "overstate[] the impact" of *Davis v. Pierse*, 7 Minn. 13 (Gil. 1), and *Agin v. Heyward*, 6 Minn. 110 (Gil. 53) (1861), by suggesting that those cases mandate application of the

(Footnote continued on next page.)

preventing the Legislature from abrogating recognized common-law causes of action. *See, e.g.*, *id.*; *Carlson v. Smogard*, 298 Minn. 362, 369, 215 N.W.2d 615, 620 (1974).

The exclusionary rule has no basis in the U.S. and Minnesota Constitutions.[6] *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2426 (referring to the exclusionary rule as a "prudential doctrine created . . . to compel respect for the constitutional guaranty" (citations omitted)); *United States v. Calandra*, 414 U.S. 338, 348 (1974) (stating the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved"). Moreover, the exclusionary rule was wholly unknown as a remedy for unreasonable searches and seizures when our state constitution came into force in 1858, and was not adopted in Minnesota for over a century until the

---

(Footnote continued from previous page.)
exclusionary rule, which did not exist until 52 years after *Davis* and *Agin* were decided. *See Weeks v. United States*, 232 U.S. 383, 392 (1914).

Justice Page also notes that neither *Olson* nor *Hickman* "addressed the Section 10 right to be free from unreasonable searches and seizures of person or property." We simply respond that the same can be said of *Davis*, *Agin*, and every other case interpreting the Remedies Clause upon which Justice Page relies.

[6] Elevating the exclusionary rule to a constitutional right, as appellant would have us do here, has its own consequences. It may, for example, impede the development of better and more effective remedies for police misconduct than the exclusionary rule. *See generally* Alicia M. Hilton, *Alternatives to the Exclusionary Rule After* Hudson v. Michigan*: Preventing and Remedying Police Misconduct*, 53 Vill. L. Rev. 47 (2008) (proposing alternatives to the exclusionary rule for remedying violations of the knock-and-announce rule); Tonja Jacobi, *The Law and Economics of the Exclusionary Rule*, 87 Notre Dame L. Rev. 585 (2011) (reassessing the costs and benefits of the exclusionary rule).

Supreme Court mandated its application to the states. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (applying the exclusionary rule to the states); *Weeks v. United States*, 232 U.S. 383, 392 (1914) (mandating the exclusionary rule in federal court). The exclusionary rule functions as a judicially created rule of evidence and does not present an affirmative or common-law right. We have never held that such a remedy is required by Article I, Section 8, of the Minnesota Constitution.

Although we have stated that "the Remedies Clause does not guarantee redress for every wrong," *Olson*, 558 N.W.2d at 497, in his dissent Justice Page nevertheless contends that *every* constitutional violation requires a remedy. Our case law demonstrates that this is not the case, particularly in the criminal context. Prior to the Supreme Court's decision in *Mapp*, we had long held that evidence obtained pursuant to an illegal search was admissible in a subsequent criminal prosecution. *See State v. Hesse*, 154 Minn. 89, 91, 191 N.W. 267, 268 (1922) (holding evidence was admissible even if the warrant was defective); *State v. Rogne*, 115 Minn. 204, 206, 132 N.W. 5, 5 (1911) (holding that evidence obtained without a search warrant was admissible); *State v. Hoyle*, 98 Minn. 254, 255-56, 107 N.W. 1130, 1130 (1906) (same). We never suggested that the Remedies Clause applied to these constitutional violations and required the evidence to be excluded, and the adoption of the exclusionary rule does not change that fact. Moreover, in criminal cases we regularly decline to remedy a constitutional error that is harmless beyond a reasonable doubt. *See, e.g.*, *State v. Shoen*, 598 N.W.2d 370, 373, 379 (Minn. 1999) (concluding that an improper restraint violated the defendant's right to a fair trial but was harmless beyond a reasonable doubt); *State v. Juarez*, 572 N.W.2d 286,

21

291, 293 (Minn. 1997) (concluding that admission of a statement obtained in violation of the Fifth Amendment was harmless beyond a reasonable doubt). The Remedies Clause does not have the reach that Justice Page suggests.[7]

D.

In his dissent, Justice Lillehaug argues that Minn. Stat. § 626.21 (2014), which he asserts is Minnesota's codification of the federal exclusionary rule, precludes this court from applying a good-faith exception. Section 626.21 provides:

> A person aggrieved by an unlawful search and seizure may move the district court . . . to suppress the use, as evidence, of anything so obtained on the ground that (1) the property was illegally seized, or (2) the property was illegally seized without warrant . . . . If the motion is granted the property . . . shall not be admissible in evidence at any hearing or trial.

Applying the *Davis* good-faith exception does not violate this statutory provision.

First, the statute provides that illegally seized property is inadmissible as evidence "[*i*]*f* the motion [to suppress] is granted." *Id.* (emphasis added). The statute, however,

---

[7] Justice Page argues that *Hesse*, *Rogne*, and *Hoyle* are unpersuasive because the Remedies Clause was not specifically raised by the parties. Regardless of the specific arguments advanced, these cases highlight the novelty of Justice Page's position—that the Remedies Clause guarantees exclusion of illegally seized evidence—when we have not recognized such a right in over 150 years of interpreting the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution.

Similarly, we rely on the harmless-error cases to demonstrate that not every constitutional violation requires a remedy. Justice Page suggests that these cases are inapposite because correction of the constitutional error would not make a difference to the outcome of the case. But this reasoning misidentifies the remedy, as we have consistently stated that the proper remedy is not simply correction of the error, but rather reversal of the conviction and a new trial. *See, e.g.*, *Shoen*, 598 N.W.2d at 377; *Juarez*, 572 N.W.2d at 291.

contains no substantive guidelines for ruling on the motion to suppress. *See id.* Thus, based on the plain language of the statute, even if the defendant claims the property was illegally seized, the statute does not prevent the district court from denying a motion to suppress because, for example, the officer relied in good faith on binding appellate precedent. *See State v. Brooks*, 838 N.W.2d 563, 575 n.3 (Minn. 2013) (Stras, J., concurring). Second, Minn. Stat. § 626.21 relates only to seized "property," or items "obtained" pursuant to an unlawful search and seizure. Here, Lindquist's blood constitutes the property seized or item obtained by the unlawful search and seizure. It is undisputed that Lindquist is not seeking the return or suppression of this property, but rather to suppress the result of tests conducted on that property. *See Brooks*, 838 N.W.2d at 575 n.3 (Stras, J., concurring).[8]

By contrast, other state courts that have rejected a good-faith exception based on a statutory exclusionary rule have done so when the statute contains mandatory requirements for the exclusion of evidence. For example, the North Carolina Supreme Court declined to adopt the *Leon* exception, in part, because N.C. Gen. Stat. § 15A-974 (1983) provided that "evidence *must be suppressed* if . . . [i]ts exclusion is required by" the federal or state constitution. *State v. Carter*, 370 S.E.2d 553, 559 (N.C. 1988)

---

[8] Contrary to Justice Lillehaug's dissent, we do not assume that the reach of Minn. Stat. § 626.21 is coextensive with that of the Fourth Amendment to the U.S. Constitution or Article I, Section 10, of the Minnesota Constitution. The Legislature, if it had so desired, could have drafted the statute to require suppression of the "fruits" of an unlawful search or seizure.

23

(emphasis added).[9] And in *State v. Garcia*, the Florida Supreme Court declined to apply the *Leon* exception because the applicable statute required suppression of wiretap evidence obtained by means of a deficient search warrant. 547 So. 2d 628, 630 (Fla. 1989) (holding that Fla. Stat. § 934.06 (1985), which provided that "no evidence derived" from a wiretap "may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter," created a statutory exclusionary rule). *But see Gary v. State*, 422 S.E.2d 426, 428 (Ga. 1992) (declining to adopt the *Leon* exception based on a statute similar in wording to Minn. Stat. § 626.21).

Second, our case law does not support Justice Lillehaug's view of section 626.21. We have noted that the exclusionary rule "need not be applied rigidly to every situation in which evidence is seized illegally." *Johnson v. State*, 673 N.W.2d 144, 149 (Minn. 2004) (citing *State v. Wiberg*, 296 N.W.2d 388, 393 (Minn. 1980)). We have also interpreted Minn. Stat. § 626.21 to allow the admission of evidence that was unlawfully obtained. *State v. Smith*, 367 N.W.2d 497, 504-05 (Minn. 1985) (declining to apply section 626.21 to evidence obtained pursuant to a search of the defendant's residence, despite the fact that the disclosure of the defendant's address to police may have been prohibited by statute, because the violation "did not subvert the basic purpose of the

---

[9] In 2011, the North Carolina General Assembly amended N.C. Gen. Stat. § 15A-974 to include a general good-faith exception and "request[ed] that the North Carolina Supreme Court reconsider, and overrule, its holding in *State v. Carter*." Act of Mar. 18, 2011, ch. 6, §§ 1-2, 2011 N.C. Sess. Laws 10, 11.

statute"). For these reasons, we conclude that Minn. Stat. § 626.21 does not preclude the adoption of the *Davis* good-faith exception to the exclusionary rule.

IV.

In summary, we hold that the exclusionary rule does not apply to violations of the Fourth Amendment to the U.S. Constitution, or Article I, Section 10, of the Minnesota Constitution when law enforcement acts in objectively reasonable reliance on binding appellate precedent. We note the narrowness of our holding, however. The *Davis* good-faith exception represents a small fragment of federal good-faith jurisprudence. The State has not asked us here to consider any other good-faith exception to the exclusionary rule, and nothing in our opinion should be construed as authorizing the application of exceptions we have not explicitly adopted. Further, the good-faith exception adopted here applies only when law enforcement officers act pursuant to binding appellate precedent, not persuasive precedent from other jurisdictions. In addition, the binding precedent must specifically authorize the behavior. Law enforcement cannot "extend the law" to areas in which no precedent exists or the law is unsettled. *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2435 (Sotomayor, J., concurring).

In his dissent, Justice Page asserts that our decision "can only be read as opening the door to adoption of the whole panoply of [good-faith] exceptions." We disagree. Justice Page correctly notes that "[t]he deterrence rationale underlies not only *Davis*, but the entire line of good-faith exception cases." Today's holding, however, merely reflects our opinion that the exclusionary rule does not deter police misconduct when applied to

25

evidence obtained during a search conducted in reasonable reliance on binding precedent.[10]

We do not decide here whether applying the exclusionary rule to evidence obtained in other ways, such as pursuant to a facially valid search warrant later held to be deficient, would provide an appreciable deterrent effect. *See generally* David Clark Esseks, Note, *Errors in Good Faith: The* Leon *Exception Six Years Later*, 89 Mich. L. Rev. 625, 633-51 (1990) (examining cases in which evidence was admitted pursuant to *Leon* even though the exclusionary rule may have deterred future police misconduct). Nor do we decide here whether the exclusionary rule should apply to evidence obtained due to police negligence. *See Herring v. United States*, 555 U.S. 135, 143-47 (2009); *see also* Jennifer E. Laurin, Essay, *Trawling for* Herring*: Lessons in Doctrinal Borrowing and Convergence*, 111 Colum. L. Rev. 670, 679-83 (2011) (asserting that the Court's reliance on police culpability constitutes a "significant change" to its exclusionary-rule jurisprudence).

---

[10] Indeed, neither the parties nor the dissents argue that applying the exclusionary rule here would result in appreciable deterrence of police misconduct, and Justice Breyer's dissent in *Davis* also fails to make this point. *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2436-40 (Breyer, J., dissenting). By contrast, in Supreme Court cases adopting other exceptions to the exclusionary rule, there was considerable debate as to whether applying the exclusionary rule to the particular circumstances of the case would deter police misconduct. *See Herring v. United States*, 555 U.S. 135, 154 (2009) (Ginsburg, J., dissenting) (arguing that the exclusionary rule incentivizes the police department to "take further precautions to ensure the integrity of its database"); *Arizona v. Evans*, 514 U.S. 1, 21 (1995) (Stevens, J., dissenting) ("The deterrent purpose extends to law enforcement as a whole, not merely to 'the arresting officer.' "); *Leon*, 468 U.S. at 953-54 (Brennan, J., dissenting) (arguing that the Court ignored the deterrent value of requiring a valid warrant).

An officer who relies on binding appellate precedent has engaged in conduct that is decidedly nonculpable. *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2435-36 (Sotomayor, J., concurring). Because culpability is not at issue here, we see no reason to address whether the exclusionary rule should apply to police "conduct [that] involves only simple, 'isolated' negligence." *Id.* at ___, 131 S. Ct. at 2427-28 (majority opinion) (quoting *Herring*, 555 U.S. at 137).[11] For these reasons, we disagree with Justice Page's view that the *Davis* good-faith exception is "inseparable from . . . *Leon* and its progeny."

V.

Finally, we turn to applying the *Davis* good-faith exception to the facts of this case. In *State v. Shriner*, we held that "[t]he rapid, natural dissipation of alcohol in the blood creates single-factor exigent circumstances that will justify the police taking a warrantless, nonconsensual blood draw from a defendant, provided that the police have probable cause to believe that defendant committed criminal vehicular operation." 751 N.W.2d 538, 545 (Minn. 2008), *abrogated by Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013). We later extended the single-factor-exigency analysis from *Shriner* to any DWI offense. *State v. Netland*, 762 N.W.2d 202, 213 (Minn. 2009), *abrogated in part by McNeely*, ___ U.S. ___, 133 S. Ct. 1552. Lindquist was charged with criminal vehicular operation and driving while impaired, and she does not assert that the officers lacked probable cause to believe she committed those offenses. Under *Shriner* and

---

[11] To the extent that *Davis* relies on the "culpability" analysis espoused in *Herring*, we endorse Justice Page's assertion that we need not rely on reasoning that is "broader than necessary to render our decision."

*Netland*, which were binding at the time of Lindquist's arrest, these circumstances created a single-factor exigency that justified a warrantless blood draw.

Lindquist nevertheless argues that the record is inadequate to determine whether the *Davis* good-faith exception applies here because the State did not argue for adoption of *Davis* until after Lindquist had been convicted; therefore, "facts which would be relevant to a determination of good faith were not developed" at trial. She states that the officer's brief testimony that "it's procedure to take a blood sample" of a person who causes a car accident involving injury is insufficient to demonstrate that he relied on binding appellate precedent.

This argument is premised on a misreading of *Davis*, which specifically states that the test for police reliance on appellate precedent is objective. ___ U.S. at ___, 131 S. Ct. at 2423-24. The Court describes "objectively reasonable reliance" by citing to *Leon*, which makes clear that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal." *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984), *cited in Davis*, ___ U.S. at ___, 131 S. Ct. at 2428. Further, the Court uses the word "compliance" interchangeably with "reliance," *e.g.*, *Davis*, __ U.S. at ___, 131 S. Ct. at 2428 ("The police acted in strict compliance with binding precedent . . . ."), suggesting that we must determine only whether an officer "complied" with precedent. The officer's subjective belief that he relied on binding precedent is irrelevant. *Cf. Heien v. North Carolina*, ___ U.S. ___, 135 S. Ct. 530, 539 (2014) (noting that a court "do[es] not examine the subjective understanding of the particular officer involved" when determining whether an officer

28

made a reasonable mistake of law).  Rather, we must determine whether a reasonable officer would have understood the binding appellate precedent as authorizing the conduct undertaken.

Here, the officer who facilitated Lindquist's blood draw acted in good-faith reliance on *Shriner* and *Netland*.[12]  He testified that he received a call from dispatch reporting a "personal injury crash," and he later learned that the passenger had suffered a head injury.  When he arrived at the Lindquists' residence, he learned that Lindquist and her husband had been in the car at the time of the accident and that Lindquist had been driving.  He observed that Lindquist's husband had blood on his hand and face.  The officer testified that Lindquist had an "unsteady gait" and her eyes were "bloodshot and watery."  He observed her fail field sobriety tests.  Based on this evidence, a reasonable officer would have understood *Shriner* and *Netland* as allowing a warrantless blood draw because there was probable cause to believe Lindquist was intoxicated when she caused a motor vehicle accident that resulted in injury.  The officer's "compliance" with *Shriner* and *Netland* was reasonable and did not extend those cases beyond their holdings.  As a result, we hold that the district court did not err in admitting the results of Lindquist's blood draw because the officer who facilitated the blood draw acted in objectively reasonably reliance on binding appellate precedent.

---

[12]  The parties dispute whether, based on the totality of the circumstances, exigent circumstances were present such that Lindquist's warrantless blood draw did not violate *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013).  Because we conclude that the exclusionary rule does not apply to Lindquist's blood draw, we need not decide this issue.

Affirmed.

D I S S E N T

GILDEA, Chief Justice (dissenting).

I respectfully dissent.  Although the good-faith exception articulated in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), applies under the United States Constitution when a search is conducted in reasonable reliance on binding appellate precedent, I would not adopt the exception under the Minnesota Constitution.  In my view, our court's repeated refusal to recognize the good-faith exception to the exclusionary rule, together with Minn. Stat. § 626.21 (2014), establish a Minnesota "tradition" that is not consistent with the application of the good-faith exception in this case.  *See State v. McMurray*, 860 N.W.2d 686, 692 (Minn. 2015) (discussing principles we use to decide when to extend broader protections under the Minnesota Constitution). I agree with Justice Page's dissent that the majority's decision is inconsistent with our history of declining to adopt the good-faith exception, and I join that aspect of his dissent. I also agree with Justice Lillehaug's analysis that Minn. Stat. § 626.21 is a statutory codification of the exclusionary rule that prevents the application of the good-faith exception in Minnesota, and I join that portion of his dissent.[1]  *See, e.g.*, *Garza v. State*, 632 N.W.2d 633, 640 (Minn. 2001) (concluding that "the good faith of the police cannot cure the absence of particularized circumstances in the warrant application"); *State v. Zanter*, 535 N.W.2d 624, 634 (Minn. 1995) (declining to adopt a good-faith exception,

---

[1]     The State does not argue that Minn. Stat. § 626.21 violates separation of powers and so we have no occasion to address that question here.

D-1

despite not questioning "the good faith of the police"). But I do not join either dissent to the extent the dissents argue that the good-faith exception violates the remedies clause under Minn. Const. art. I, § 8.[2]

---

[2]    The State argues that the exclusionary rule does not violate the remedies clause because citizens are able to file a lawsuit under 42 U.S.C. § 1983 (2012). Because I conclude that the good-faith exception does not apply under Minnesota law, I need not decide whether a civil suit under 42 U.S.C. § 1983, is sufficient to satisfy Minn. Const. art. I, § 8. The State also argues that the search was constitutional under the exigency exception. I would not reach that issue because it was not presented to the district court. *See State v. Sorenson*, 441 N.W.2d 455, 459 (Minn. 1989) (declining to rule on the validity of a warrantless seizure because it was not raised at the district court, and there was "insufficient information in the trial court record" on the issue).

DISSENT

PAGE, Justice (dissenting).

I respectfully dissent. It is apparent that the court is willing to go to any length—including ignoring Minn. Const. art. I, § 8,[1] and art. I, § 10[2]—to protect its erroneous decision in *State v. Shriner*, 751 N.W.2d 538, 545 (Minn. 2008) (establishing that the evanescent nature of alcohol in the bloodstream is a single-factor exigency), *abrogated by Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552, 1568 (2013) (holding that, contrary to this court's decision in *Shriner*, the dissipation of alcohol in the blood does not create a per se exigency), and its progeny. In *State v. Bernard*, we "fundamentally depart[ed] from longstanding Fourth Amendment principles" to justify a warrantless breath test as a valid search incident to arrest—"creating a novel bright-line rule" that

---

[1]    Article I, Section 8, of the Minnesota Constitution provides:

   *Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character*, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws.

(Emphasis added.)

[2]    Article I, Section 10, of the Minnesota Constitution provides:

   *The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated*; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

(Emphasis added.)

"simply readopts a per se exigency under a different name." 859 N.W.2d 762, 774, 779 (Minn. 2015) (Page, J., & Stras, J., dissenting jointly). Now, adopting the good-faith exception, the court cavalierly ignores Minn. Const. art. I, § 8, and would have us believe, contrary to federal precedent and its own reasoning, that its decision is a "narrow" one. The court acts as though "we live[] in a world without *Missouri v. McNeely*," *Bernard*, 859 N.W.2d at 774 (Page, J., & Stras, J., dissenting jointly), and without Minn. Const. art. I, § 8. "But we do not live in such a world." *Id. McNeely* is decided, and the court can avoid Minn. Const. art. I, § 8, only by mischaracterizing the right at issue in this case and taking away the only available remedy for the violation of a constitutional right. The court accomplishes this by equating violations of Minn. Const. art. I, § 10, to causes of action not recognized at the common law—a concept not contemplated by the drafters of Article I, Section 8.

I.

The court asserts that its decision to adopt the good-faith exception to the exclusionary rule articulated in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), does not violate Minn. Const. art I, § 8, because the exclusionary rule is neither a constitutional right nor a remedy "vested at common law." (Emphasis omitted.) The court's assertion rests on two erroneous assumptions: (1) that the right at issue is the exclusionary rule itself, which it is not; and (2) that Article I, Section 8, is limited to remedies that vested at common law, which it is not. The rights at issue are the constitutional right to be free from unreasonable searches and the separate constitutional right to a remedy for a violation of the right to be free from unreasonable searches and

seizures. In relying on the above assumptions, the court ignores the constitutional nature of the right to a remedy and misconstrues our Article I, Section 8, precedent to serve its own purposes.

As an initial matter, the court incorrectly frames the question of whether adopting the *Davis* good-faith exception violates Minn. Const. art I, § 8. The question is not whether the *exclusionary rule* is itself a constitutional right, but whether the right underlying the exclusionary rule—the prohibition in Minn. Const. art. I, § 10, against unreasonable searches and seizures—is encompassed within the guarantee in Article I, Section 8, of a "certain remedy in the laws." Undoubtedly it is.

Article I, Section 1, of the Minnesota Constitution states that "[g]overnment is instituted for the security, benefit and protection of the people." Contained within this concept is the notion that the State must uphold and protect certain rights recognized in our state constitution as fundamental, including the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." Minn. Const. art. I, § 10. Just as fundamental as the right to be free from unreasonable searches and seizures, expressed in Section 10, is Section 8's guarantee of the right to a remedy in the laws "for all injuries or wrongs" to one's "person, property or character." *See Davis v. Pierse,* 7 Minn. 13, 18 (Gil. 1, 6) (1862) (explaining that neither the right to a jury trial, nor the right to be free from unreasonable searches and seizures, "is more sacred to the citizen, or more carefully guarded by the constitution, than the right to have a certain and prompt remedy in the laws for all injuries or wrongs to person, property, or character").

The guarantee in Article I, Section 8, of a remedy is not only "carefully guarded by the constitution," *Davis*, 7 Minn. at 18 (Gil. at 6), but it is also broad.  Nothing in the language of Section 8 indicates that the guarantee of a "remedy in the laws" for "*[e]very* person," and for "*all* injuries or wrongs . . . to [one's] person, property or character," Minn. Const. art. I, § 8 (emphasis added), was intended to exclude violations of constitutional rights by State actors—particularly when the right at issue is as closely connected to protection of an individual's "person" and "property" as that guaranteed by Section 10.  *See* Minn. Const. art. I, § 10 (guaranteeing "[t]he right of the people to be secure in their *persons, houses, papers, and effects* against unreasonable searches and seizures" (emphasis added)).  The connection between Section 10's protection of person and property and Section 8's guarantee of a remedy for all injuries or wrongs to person or property (or character) is set out in decisions rendered by our court shortly after the Minnesota Constitution was ratified.  In these decisions our predecessors, as did the drafters of the Minnesota Constitution,[3] understood the person and property rights

---

[3]    At the convention, Republican and Democratic delegates caucused separately, drafting two state constitutions.  The Democratic draft did not contain a remedies provision, nor was a remedies provision proposed or debated by the Democratic delegates.  William Anderson & Albert J. Lobb, *A History of the Constitution of Minnesota* 118 (1921); Ruth Mickelsen, *The Use and Interpretation of Article I, Section Eight of the Minnesota Constitution 1861-1984*, 10 Wm. Mitchell L. Rev. 667, 674 (1984); *see generally Debates and Proceedings of the Minnesota Constitutional Convention* (1857) (Earle S. Goodrich, printer, 1857) (containing debates of the Democratic convention).  The provision instead originates in the Republican draft.

(Footnote continued on next page.)

protected in Article I, Sections 8 and 10, to be rights inherent in and fundamental to every person. For example, in the context of discussing the scope of Article I, Section 8, we have stated, "The chief end of government is the protection of the rights of all—the bad no less than the good—and, *even without a constitutional provision, every member of society may rightfully claim protection of his person and property*." *Davis*, 7 Minn. at 18 (Gil. at 6) (emphasis added) (relying, in part, on Article I, Section 8, to conclude that a legislative act "suspending the privilege of all persons aiding the rebellion against the United States, of prosecuting and defending actions and judicial proceedings in this State" was unconstitutional).

---

(Footnote continued from previous page.)

One Republican representative questioned the necessity of Article I, Section 8's, provisions because the guarantee of a remedy was implied by the existence of inherent rights and the understanding that the object of government is to secure such rights:

> It seems to me that the whole section is unnecessary. We have already declared that men have *certain inherent rights*, among which are *life, liberty and the pursuit of happiness*; and to secure those rights governments are instituted among men, deriving their just powers from the consent of the governed. *If these are inherent rights and governments are instituted to secure them, does it not follow as a natural presumption that persons are entitled to a remedy if deprived of those rights?*

Debates and Proceedings of the Constitutional Convention for the Territory of Minnesota 105 (George W. Moore, printer, 1858) (emphasis added). Obviously, the representative's comment was rejected. The Remedies Clause was adopted by the Republican Convention and ultimately included as part of Minnesota's Constitution. Clearly the Constitution's drafters wanted to make it explicitly clear that the rights enumerated in the Constitution included a right to a remedy for their violation.

In *Baker v. Kelley*, we relied upon Article I, Sections 7[4] and 8, to declare unconstitutional a tax law that required persons whose real property was sold in a tax sale to bring an action testing the sale's validity within 1 year of the recording of the tax deed or forever be barred from asserting ownership in the property. 11 Minn. 480, 499 (Gil. 358, 376-77) (1866). Because the limitations period commenced with the recording of the tax deed, which could occur at a point in time before the owner's possession was contested, the law, in effect, required an owner in possession of real estate to either *anticipate* a dispute concerning his or her title and institute legal proceedings to prove ownership or suffer loss of title. *Id.* at 495-96 (Gil. at 372-74). We reasoned that the challenged law violated Article I, Sections 7 and 8, by effectively denying, or placing impermissible conditions on, the ability of persons to vindicate their constitutionally guarded property rights. *Id.* at 498-99 (Gil. at 376-77). Specifically, we said:

> The statute would deprive a person of his property if he fails to do an act which may be done or omitted without any violation of law, and which neither his duty or interest requires him to do, and makes the performance of such act a condition to his right to sue for or defend his property in the courts; whereas the constitution declares that he shall not be deprived of his property by any mere legislative act, *and that he shall be entitled to "justice freely and without purchase, completely and without denial, promptly and without delay, conformably to the laws."* . . . We do not mean to question the power of the Legislature to require a party to pay the necessary costs of litigation, or to prescribe rules for the guidance of courts and litigants, *but it seems very clear that beyond this they cannot attach any conditions or limits to the rights that are guaranteed absolutely, unconditionally, freely and certainly, by the constitution.* In attempting to do this, the law of 1862

---

[4] Article I, Section 7, of the Minnesota Constitution states, in relevant part, that "[n]o person shall . . . be deprived of life, liberty or property without due process of law").

is in conflict with [Minn. Const. art. I, §§ 7, 8], and it cannot therefore be sustained.

*Id.* at 489-99 (Gil. at 376-77) (emphasis added). We further indicated that the guarantees of due process and a certain remedy in the laws in Sections 7 and 8 extended not only to vindication of property rights, but also rights more closely associated with protection of the "person": "It will be observed that our constitution guards property with the same care that it does life and liberty. If the plaintiff can be deprived of his property for the act or omission complained of, so he could of his life or liberty." *Id.* at 499 (Gil. at 377).

More broadly, our early Article I, Section 8, decisions indicate that, at the time Section 8 was adopted, entitlement to a remedy was understood to flow from the existence of legal rights. In *Agin v. Heyward*, we addressed whether a district court's jurisdiction encompassed the enforcement of a mechanic's lien for less than $100, despite the fact that the state constitution specifically granted original jurisdiction to the district courts only in cases in which the amount in controversy exceeded $100. 6 Minn. 110, 112 (Gil. 53, 55-56) (1861). We concluded that district courts have original jurisdiction "in every case where the constitution itself does not clearly confer it on some other court," *id.* at 118 (Gil. at 62), reasoning that the Minnesota Constitution does not contemplate an interpretation that "would admit the possibility of there being *a legal right that could not be judicially enforced, or a wrong without a remedy* therefor in the law." *Id.* at 115 (Gil. at 59) (emphasis added). Pointing to Article I, Section 8, we stated that "every person is entitled to a certain remedy in the laws," and specified that "*[t]his includes the enforcement of rights* as well as the redress of wrongs." *Id.* (Gil. at 59)

(emphasis added).  Notably, *Agin* specifically dealt with a statutory right (to a mechanic's lien).  *Id.* at 110 (Gil. at 55).  If we could not conceive of an interpretation of the Minnesota Constitution that "would admit the possibility of there being *a legal right that could not be judicially enforced, or a wrong without a remedy*" in the context of a legislatively created right, *id.* at 115 (Gil. at 59) (emphasis added), it is difficult to understand how we could conceive of a constitutionally recognized right without a remedy.[5]

---

[5]    The court cites a number of cases to support its assertion that not every constitutional violation requires a remedy—particularly in the criminal context.  First, the court notes that, before the United States Supreme Court applied the exclusionary rule to the states in *Mapp v. Ohio*, 367 U.S. 643 (1961), we repeatedly had held that evidence obtained pursuant to an illegal search was admissible in a subsequent criminal proceeding, and that "[w]e never suggested that the Remedies Clause applied to these constitutional violations."  *See State v. Hesse*, 154 Minn. 89, 91, 191 N.W. 267, 268 (1922); *State v. Rogne*, 115 Minn. 204, 206, 132 N.W. 5, 5 (1911); *State v. Hoyle*, 98 Minn. 254, 255-56, 107 N.W. 1130, 1130 (1906).  But my review of the briefs filed in the cases cited by the court confirms that the applicability of the Remedies Clause was never raised by any of the parties in those cases and thus the issue was not decided by the court.  The fact that the Remedies Clause was not raised does not mean that the Remedies Clause does not apply to illegal searches.

Second, the court notes that "we regularly decline to remedy a constitutional error that is harmless beyond a reasonable doubt," pointing to cases in which we declined to reverse the defendant's conviction and grant a new trial based on a constitutional violation.  *E.g.*, *State v. Shoen*, 598 N.W.2d 370, 373, 379 (Minn. 1999); *State v. Juarez*, 572 N.W.2d 286, 291, 293 (Minn. 1997).  But the court mistakenly conflates the defendant's right to a remedy with the right to a new trial.  The two are not the same.  As the court intimates, a defendant does not have the right to a *specific* remedy.  Unless a constitutional error is structural in nature, the remedy is not necessarily the reversal of the conviction and the grant of a new trial; instead, in the context of the admission of illegally obtained evidence, the remedy is review of the trial without consideration of that evidence.  *Cf. Shoen*, 598 N.W.2d at 375 ("[T]he Supreme Court has distinguished 'structural defect affecting the framework within which the trial proceeds' from ' "trial

(Footnote continued on next page.)

In this context, it is clear that Section 8's guarantee of a "certain remedy in the laws" applies to rights guaranteed by the constitution, particularly rights, like that guaranteed by Section 10, relating to protection of person and property. The court, however, highlights cases in which we addressed common law, rather than constitutional, rights and remedies to assert that the protections of Article I, Section 8, do not extend to injuries or wrongs related to Article I, Section 10, violations. In *Hickman v. Group Health Plan, Inc.,* we stated that, "[S]ection 8 . . . only assures remedies for rights that vested at common law. The purpose of the section is to protect common law rights and remedies for which the legislature has not provided a reasonable substitute." 396 N.W.2d 10, 14 (Minn. 1986). Specifically, we concluded in *Hickman* that a statute prohibiting wrongful life and wrongful birth actions did not violate Minn. Const. art. I, § 8, because such actions were not remedies for rights that existed at common law. *Id.* at 12, 14. Similarly, in *Olson v. Ford Motor Co.,* we concluded that application of the "seat belt gag rule" to preclude evidence of seat belt use in a crashworthiness action involving an allegedly defective seat belt did not violate Article I, Section 8, because the remedy for

---

(Footnote continued from previous page.)
error"—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of the evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.' " (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307-10 (1991))). If through such review the court determines that the constitutional error was "harmless beyond a reasonable doubt"—in other words, that the verdict rendered was "surely unattributable" to the error, *Schoen*, 598 N.W.2d at 377—no further remedy is required. But if the verdict cannot be separated from the error, further remedial action is necessary, i.e., the defendant is entitled to a new trial free of the taint of the constitutional violation.

crashworthiness actions had not vested at common law by the time the Legislature passed the gag rule. 558 N.W.2d 491, 496-97 (Minn. 1997).

The court asserts that, "[a]lthough some of our early cases suggest an expansive reading of the Remedies Clause, . . . we have subsequently held that the Remedies Clause 'does not guarantee redress for every wrong, but instead enjoins the [government] from eliminating those remedies that have *vested at common law*.' " (Citing *Olson*, 558 N.W.2d at 497; *Hickman*, 396 N.W.2d at 14.) This assertion has several problems, not least of which is the court's characterization of our early Article I, Section 8, cases. We did not in these cases "suggest" an "expansive reading" of the Remedies Clause. Instead, we made it clear that Section 8's statement that "[e]very person is entitled to a certain remedy in the laws for all injuries and wrongs . . . to . . . person, property or character" should be given effect and that the right to a remedy should be regarded as a constitutional right on equal footing with the other guarantees contained within Article I of the Minnesota Constitution. For example, in *Agin v. Heyward* we explained that the Minnesota Constitution does not contemplate an interpretation that "would admit the possibility of there being a legal right that could not be judicially enforced, or a wrong without a remedy therefor in the law." 6 Minn. at 115 (Gil. at 59). In *Davis v. Pierse,* we emphasized that Section 8's guarantee of a remedy is as "sacred" as the other rights secured by the constitution:

> We would never for one moment suppose that the legislature has the power, under the constitution, to deprive a person, or class of persons, of the right of trial by jury, or to subject them to imprisonment for debt, or their persons, houses, papers and effects, to unreasonable searches; or their property to be taken for public use without just compensation; and *yet*

*neither of these is more sacred to the citizen, or more carefully guarded by the constitution, than the right to have a certain and prompt remedy in the laws for all injuries or wrongs to person, property, or character.*

*Davis*, 7 Minn. at 18 (Gil. at 6) (emphasis added).

Further, we held in early cases like *Davis* and *Baker v. Kelley* that the Legislature violated Article I, Section 8, when it enacted laws that denied or effectively denied the ability of persons to vindicate constitutionally guarded rights. As noted above, the tax law challenged in *Baker* was deemed to violate Section 8 because it placed impermissible conditions on the ability of persons to enforce or defend their constitutionally guarded property rights. 11 Minn. at 498-90 (Gil. at 376-77). In *Davis*, we held that, under Article I, Section 8, the Legislature could not "directly or indirectly, for any cause whatsoever, deprive [a person] of his [or her] *constitutional right* to commence, maintain, or defend any action or other judicial proceeding." 7 Minn. at 20 (Gil. at 8) (emphasis added).

The court not only minimizes the import of our early Remedies Clause cases, but also grossly overstates the impact of our more recent Remedies Clause cases, *Hickman* and *Olson*.[6] First, neither *Hickman* nor *Olson* addressed the Section 10 right to be free from unreasonable searches and seizures of person or property, *or any other*

---

[6] The court attempts to minimize its reliance on *Olson* and *Hickman*, asserting that the "single reference" to *Olson* and *Hickman* "merely support[s] [the court's] conclusion that the Remedies Clause is more limited than Justice Page contends." I would point out that *Olson* and *Hickman* constitute the only legal authority cited by the court in support of its contention that the Remedies Clause has been limited in scope to remedies that have vested at common law.

*constitutionally recognized right.*[7]   Notably, *Hickman* addressed causes of action,

wrongful birth and wrongful life, that not only have no basis in the constitution, but also

have no basis in the common law or in statute.  Therefore, our statement in *Hickman* that

Article I, Section 8, only assures remedies for rights that vested at common law was

broader than necessary to render our decision and is thus dictum—dictum that fails to

acknowledge, much less distinguish our early Section 8 decisions.  Instead, *Hickman*

cites, without explanation, to our decision in *Haney v. International Harvester Co.*, 294

Minn. 375, 201 N.W.2d 140 (1972), for support.  396 N.W.2d at 14.  *Haney*, however,

---

[7]     The court responds that, while neither *Olson* nor *Hickman* addressed the right under Minn. Const. art. I, § 10, to be free from unreasonable searches and seizures of person or property, "the same can be said of *Davis v. Pierse*, *Agin*, and every other case interpreting the Remedies Clause upon which Justice Page relies."  The court also asserts that I overstate the impact of *Davis*, *Agin*, and similar cases "by suggesting that those cases mandate application of the exclusionary rule, which did not exist until 52 years after *Davis* and *Agin* were decided."  There are multiple problems with these assertions. First, my position is that Article I, Section 8, guarantees a remedy for rights "guarded by the constitution," *Davis*, 7 Minn. at 18 (Gil. at 6)—*including* the rights found in Article I, Section 10.  As discussed above, *Baker* and *Davis* deemed laws to be in violation of Article I, Section 8, when they precluded persons from vindicating or exercising *constitutionally guarded* rights.  *See Baker*, 11 Minn. at 498-99 (Gil. at 376-77); *Davis*, 7 Minn. at 20 (Gil. at 8).  I would also note that, while the court is correct that *Davis* and *Baker* do not specifically address rights guaranteed by Article I, Section 10, in *Davis* we expressly placed the right to a remedy for all wrongs to "person, property, or character" on equal footing with Article I, Section 10.  *Davis*, 7 Minn. at 18 (Gil. at 6) (stating that the right of the people to be free in their "persons, houses, papers, and effects" from "unreasonable searches" is no "more sacred to the citizen, or more carefully guarded by the constitution" than the Article I, Section 8, right to a remedy).  Given the equal constitutional footing of Sections 8 and 10, I find it difficult to understand how wrongs to person or property that violate Section 10 are somehow outside the purview of Section 8's guarantee of a remedy.  Finally, I do not contend that Article I, Section 8, or our cases construing Article I, Section 8, "mandate application of the exclusionary rule" specifically—only that they mandate *a* remedy.

includes no statement limiting application of Article I, Section 8, to remedies for rights that vested at common law. *See generally Haney*, 294 Minn. 375, 201 N.W.2d 140. It is difficult to believe that our decisions in *Hickman* and *Olson* overruled cases that, like *Davis*, 7 Minn. at 18 (Gil. at 6), addressed the issue of a remedy for the violation of a constitutional right when that issue was not before us in either *Hickman* or *Olson* and when we made no reference to the *Davis* line of cases. *See also Baker,* 11 Minn. at 498-90 (Gil. at 376-77); *Agin,* 6 Minn. at 115, 118 (Gil. at 59, 62).

The court's reliance on *Olson* also is misplaced because, under our reasoning in *Olson*, it is not entirely clear that the exclusionary rule did not "vest" at common law. In *Olson,* we indicated that "vested at common law" simply means that the remedy must be older than the statute or rule allegedly eliminating or impairing it. *See* 558 N.W.2d at 497 (concluding that there was no violation of Minn. Const. art. I, § 8, because judicial recognition of the crashworthiness doctrine in *Larsen v. General Motors Corp.*, 391 F.2d 495, 502 (8th Cir. 1968), occurred 5 years *after* the seat-belt-gag rule was enacted by the Legislature). Here, our recognition in 1993 that the exclusionary rule applies to evidence obtained in violation of Minn. Const. art. I, § 10, clearly predates our adoption, in this case, of the good-faith exception to that rule. *See In re Welfare of E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993) (applying exclusionary rule to evidence discovered as a result of a violation of Minn. Const. art. I, § 10); *see also State v. Fort*, 660 N.W.2d 415, 418-19 (Minn. 2003) (same); *In re Welfare of B.R.K.*, 658 N.W.2d 565, 578-80 (Minn. 2003) (same). Therefore, applying *Olson's* reasoning and the court's adoption of that

reasoning, the exclusionary rule in fact vested at common law and comes within the Remedies Clause in Article I, Section 8.

I would also note that this court's decisions in cases like *Hickman* and *Olson* more broadly reflect separation of powers concerns and "the court's reluctance to interfere with legislative schemes regulating complex social or political problems." *See* Ruth Mickelsen, *The Use and Interpretation of Article I, Section Eight of the Minnesota Constitution 1861-1984*, 10 Wm. Mitchell L. Rev. 667, 684 (1984); *see also Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 316-17 (Minn. 2006) (concluding that application of the filed-rate doctrine to bar insureds' challenge to a premium surcharge would not violate Minn. Const. art. I, § 8, because the Legislature provided a "reasonable substitute" in the form of investigation and review by the Department of Commerce); *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 789 (Minn. 1989) (concluding that municipal damages cap did not violate Minn. Const. art. I, § 8, because the purpose of the cap is a "legitimate legislative objective"); *Breimhorst v. Beckman*, 227 Minn. 409, 436, 35 N.W.2d 719, 735-36 (1949) (compulsory Worker's Compensation Act does not violate Minn. Const. art. I, § 8, because it provides a remedy that is an "adequate substitute" for common law or statutory action for damages for injuries sustained by employee in his or her employment). The same concerns regarding separation of powers and legislative deference are not present in a situation that, like here, involves violation of a person's constitutional right to be free, in his or her person and property, from unreasonable searches and seizures, and a judicially created, rather than legislatively created, remedy.

For these reasons, Minn. Const. art. I, § 8, requires a remedy for violations of Lindquist's constitutional right to be free from unreasonable searches and seizures.

II.

The next question that must be addressed is whether the good-faith exception to the exclusionary rule leaves defendants without a "certain remedy in the laws," in violation of Minn. Const. art. I, § 8. Generally, we have only found violations to our constitution's Remedies Clause when a remedy for a wrong is completely lacking. *See, e.g., Carlson v. Smogard*, 298 Minn. 362, 366-69, 215 N.W.2d 615, 618-19 (1974) (concluding that a worker's compensation law was unconstitutional in part because it abrogated a third-party tortfeasor's common law right to indemnity without providing a "reasonable substitute" or pursuing a "legitimate legislative objective"); *Baker*, 11 Minn. at 493-94 (Gil. at 376-77) (concluding that a limitations provision in a tax statute was unconstitutional in part because its practical effect was to deny a remedy in most cases); *Davis*, 7 Minn. at 20 (Gil. at 8) (concluding that a statute violated Article I, Section 8, when it barred all persons who aided the "rebellion against the United States" from prosecuting or defending legal actions in the state).

The practical effect of the good-faith exception is to deny *any* meaningful remedy to persons deprived of their constitutional right to be free from unreasonable searches and seizures of person and property, which includes searches and seizures of blood or breath.[8]

---

[8] The court asserts that rejecting the *Davis* good-faith exception on the basis of the Remedies Clause would "elevat[e] the exclusionary rule to a constitutional right," which

(Footnote continued on next page.)

D-15

*Cf. Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616-17 (1989) ("Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis, implicates similar concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber*, should also be deemed a search." (citations omitted)); *Schmerber v. California*, 384 U.S. 757, 767-68 (1966) (recognizing that a "compelled intrusion[] into the body for blood to be analyzed for alcohol content" must be deemed a Fourth Amendment search).

---

(Footnote continued from previous page.)
would have the effect of "imped[ing] the development of better and more effective remedies for police misconduct than the exclusionary rule." The court mischaracterizes my position. I do not contend that the exclusionary rule is a constitutional right; I contend only that Minn. Const. art. I, § 8, requires a remedy for a violation of Minn. Const. art. I, § 10. If the exclusionary rule were replaced with a remedy that was in fact "better and more effective," there would be no violation of Article I, Section 8. *See Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 316 (Minn. 2006) ("[T]he Minnesota Constitution only protects 'remedies for which the legislature has not provided a reasonable substitute.' " (quoting *Hickman*, 396 N.W.2d at 14)). But that is not the case here.

The Legislature not only may constitutionally create a "reasonable substitute" remedy, but, as Justice Lillehaug discusses in his dissent, has in fact created a remedy for unconstitutional searches and seizures. *See* Minn. Stat. § 626.21 (2014) ("A person aggrieved by an unlawful search and seizure may move the district court . . . for the return of the property and to suppress the use, as evidence, of anything so obtained . . . ."). Although this court has "primary responsibility under the separation of powers doctrine for the regulation of evidentiary matters," *State v. Olson*, 482 N.W.2d 212, 215 (Minn. 1992), section 626.21, does not, in my view, impermissibly encroach upon a judicial function. Article I, Section 8, as we have construed it, gives the Legislature authority to create alternative remedies; with section 626.21, the Legislature has done just that, permitting persons who have been subjected to an unlawful search or seizure to bring a motion for the return of the property seized and prohibiting prosecutors from using the fruits of the unlawfully obtained evidence. Accordingly, section 626.21 provides a remedy that is just as valid as the judicially created exclusionary rule and that could be applied here. But it would appear the court is not interested in *any* remedy.

The State claims that citizens are provided adequate remedies because federal law permits a person aggrieved by an unconstitutional search to file a lawsuit under 42 U.S.C. § 1983 (2012) (establishing a civil cause of action for persons whose federal constitutional or statutory rights were violated by a person acting under color of state law). A section 1983 action can hardly be classified as an "adequate remedy" because section 1983 does not provide a remedy for searches and seizures that violate Article I, Section 10, of the Minnesota Constitution. *See West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by *the Constitution and laws of the United States . . . .*" (emphasis added)). Rights secured by Article I, Section 10, are not rights "secured by the Constitution and laws of the United States."

Finally, the court's reliance on the characterization of the exclusionary rule as an institutional deterrent does not alter the applicability of Article I, Section 8. In *Agin v. Heyward*, we broadly characterized Section 8's guarantee of a remedy as including "the *enforcement of rights* as well as the redress of wrongs." 6 Minn. at 115 (Gil. at 59). In that regard, it is worth noting that the Supreme Court of North Carolina relied, in part, on the Remedies Clause in its state constitution[9] to reject the *Leon* good-faith exception to the exclusionary rule, despite the court's characterization of the exclusionary rule as an

---

[9]    Article I, section 18, of the North Carolina Constitution provides:

> All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay.

"institutional deterrent" rather than an individual remedy. *State v. Carter*, 370 S.E.2d 553, 560 (N.C. 1988). The court explained that damages actions are inadequate alternatives to the exclusionary rule, reasoning that while it "may provide some relief upon occasion to an individual whose rights have been invaded . . . [it] offers scant prospect of replacing the exclusionary rule as an institutional deterrent to unconstitutional invasions of privacy." *Id.* Then the court stated, "Article I, section 18 of our state constitution directs our courts to provide every person with a remedy for injury. We will not abandon a proven remedy in favor of one which, because its ineffectualness is patent beforehand, mocks this constitutionally mandated guaranty." *Id.*

Given the practical impact of the good-faith exception and the broad understanding of Article I, Section 8, we expressed in *Agin* and other cases, the court's adoption of the good-faith exception in this case, as in *Carter*, mocks Section 8's constitutionally mandated guarantee of a "certain remedy in the laws" and leaves those whose rights have been violated under Article I, Section 10, without a remedy. In the process, the court also mocks the legislatively created remedy for violations of Article I, Section 10, in Minn. Stat. § 626.21 (2014), discussed in detail in Justice Lillehaug's dissent, which I join.

III.

The court's decision in this case is not only inconsistent with Minn. Const. art. I, § 8, but is also inconsistent with the reasoning of *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011). Further, the court's decision is disingenuous as to its ultimate impact. Over the past 30 years we have steadfastly declined to adopt the good-faith

D-18

exception for search and seizure violations, until now. *See, e.g.*, *State v. Brooks*, 838 N.W.2d 563, 575 (Minn. 2013) (Stras, J., concurring) (noting that we had yet to adopt the good-faith exception and had again declined the opportunity to do so); *State v. Jackson*, 742 N.W.2d 163, 180 n.10 (Minn. 2007) ("We note, however, that we have consistently declined to adopt, much less even address, the *Leon* 'good faith' exception."); *State v. Harris*, 589 N.W.2d 782, 791 n.1 (Minn. 1999) ("[W]e need not address the state's request for us to adopt the 'good faith' exception to the warrant requirement . . . ."); *State v. Zanter*, 535 N.W.2d 624, 634 (Minn. 1995) ("[W]e decline at this time to address the applicability of a good faith exception."); *State v. Lindsey*, 473 N.W.2d 857, 864 n.4 (Minn. 1991) ("[W]e need not and do not address the state's contention that this court should follow the so-called good faith exception to the exclusionary rule adopted and applied by the United States Supreme Court . . . ."); *State v. McCloskey*, 453 N.W.2d 700, 701 n.1 (Minn. 1990) ("In view of our decision we do not address the issue of whether this court should follow *United States v. Leon* . . . .").

After today, the exception will swallow the rule. While the court emphasizes the "narrowness" of its holding, stating that "[t]he *Davis* good-faith exception represents a small fragment of federal good-faith jurisprudence" and that "nothing in our opinion should be construed as authorizing the application of exceptions we have not explicitly adopted," the opinion can only be read as opening the door to adoption of the whole panoply of exceptions. The court's suggestion that it can pick and choose "fragments" of federal good-faith jurisprudence is nonsense given its reliance on the rationale that deterrence of police misconduct is the "touchstone" of the exclusionary rule.

The deterrence rationale underlies not only *Davis*, but the entire line of good-faith exception cases, extending back to *United States v. Leon*, 468 U.S. 897, 920 (1984) (holding that application of the exclusionary rule is unwarranted when police conduct a search in reasonable reliance on a facially valid search warrant later determined to lack probable cause). The Supreme Court expressly recognized in *Davis* that:

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way.

___ U.S. at ___, 131 S. Ct. at 2427-28 (citations omitted). The Court makes clear that the same rationale justifies its decision in *Davis*, explaining that "[u]nder our exclusionary-rule precedents, [the] acknowledged absence of police culpability dooms Davis's claim," and that "in 27 years of practice under *Leon's* good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Id.* at ___, 131 S. Ct. at 2428-29.

Furthermore, I find it difficult to ascertain a meaningful distinction between the deterrent effect of the *Davis* good-faith exception expressly adopted in this case and the other good-faith exceptions adopted by the United States Supreme Court. If a warrant is valid on its face, as in a *Leon*-type situation, 468 U.S. at 920, what misconduct is there to deter when law enforcement executes a search or seizure in reliance on that warrant? Even in the context of police "conduct [that] involves only simple, 'isolated' negligence,"

D-20

*Davis*, ___ U.S. at ___, 131 S. Ct. at 2427 (citation omitted), the exclusionary rule arguably does not provide a meaningful deterrent effect. *See Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it . . . .").

In other words, the *Davis* good-faith exception is premised on, and inseparable from, *Leon* and its progeny. Therefore, it is difficult to understand how the court can suggest that its decision in this case has no implication beyond adoption of the specific good-faith exception created in *Davis* when the court says nothing that meaningfully distinguishes its reasoning from that of the Supreme Court in *Leon* and its progeny.

For these reasons, I respectfully dissent.

DISSENT

LILLEHAUG, Justice (dissenting).

Although I cannot share his sentiments regarding *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), in all other respects I join Justice Page's dissent. As he explains with characteristic eloquence, reflecting his passion for justice, the so-called "good-faith exception" adopted by the majority violates the Minnesota Constitution, Article I, Sections 8 and 10. I write separately to observe that the exception to the exclusionary rule adopted by the majority violates not only the Remedies Clause of the Minnesota Constitution, but also the Minnesota statute that requires the remedy of suppression of the evidence from an illegal search or seizure, Minn. Stat. § 626.21 (2014).

Article I, Section 10 of the Minnesota Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." But Section 10 does not contain a remedy for its violation. Article I, Section 8, however, guarantees "a certain remedy in the laws" for injuries or wrongs.

To respond to violations of Section 10, and to implement the promise of Section 8, the Legislature has provided a statutory remedy for an unlawful search and seizure. Enacted more than 50 years ago and never substantively amended, Minn. Stat. § 626.21 provides: "A person aggrieved by an unlawful search and seizure may move the district court . . . to suppress the use, as evidence, of anything so obtained . . . ." The statute further commands the remedy: "If the motion is granted the property shall be restored . . . and it shall not be admissible in evidence at any hearing or trial." *Id.*

D-1

In this case, the majority tacitly concedes that the search and seizure of blood without consent or a warrant was *unlawful*. *See Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552, 1563 (2013) (concluding that the natural dissipation of alcohol from the bloodstream does not constitute an exigency in every drunk-driving case sufficient to justify a warrantless blood draw). As the majority acknowledges, the issue then is the appropriate legal *remedy* for the constitutional violation.

In section 626.21, the Legislature specified precisely the remedy: suppression. The statute could not be clearer; what is searched and seized unlawfully "*shall not be admissible in evidence* at any hearing or trial." Minn. Stat. § 626.21 (emphasis added). Hardly anyone needs to be reminded that this court routinely applies the clear, unambiguous words of Minnesota statutes. *See* Minn. Stat. § 645.16 (2014); *Axelberg v. Comm'r of Pub. Safety*, 848 N.W.2d 206, 212 (Minn. 2014) ("[W]e must read this state's laws as they are, not as some argue they should be."); *Larson v. State*, 790 N.W.2d 700, 703 (Minn. 2010) ("If a statute is unambiguous, then we must apply the statute's plain meaning."). The majority's holding conflicts with this state's laws as they are.

If there were any ambiguity in section 626.21, which there is not, we would look to, among other things, the occasion and necessity for the law, the circumstances under which it was enacted, the mischief to be remedied, the object to be obtained, and the contemporaneous legislative history. *See* Minn. Stat. § 645.16(1)-(4), (7). While I have been unable to locate any legislative hearings or reports on the 1963 passage of section 626.21, the reason for, and context of, its enactment are not difficult to discern. In *Mapp v. Ohio*, 367 U.S. 643 (1961), the United States Supreme Court decided that evidence

obtained from unreasonable searches and seizures may not be used in state criminal law

proceedings. Plainly, section 626.21, enacted in the aftermath of *Mapp*, is Minnesota's

codification of the federal exclusionary rule.[1] At the time, the federal rule contained no

good-faith exception. While the federal rule was subsequently amended to address the

good-faith exception created by the U.S. Supreme Court,[2] Minnesota has not legislated

away the protection of privacy guaranteed by the statute.

Three years after Minnesota enacted section 626.21, Georgia passed a strikingly

similar law, Ga. Code Ann. § 17-5-30 (West 1966).[3] When it considered whether to

adopt the *Leon* good-faith exception, the Georgia Supreme Court considered the effect of

its legislature's codification of the exclusionary rule. *See Gary v. State*, 422 S.E.2d 426

(Ga. 1992). The court held that it had no power to adopt the exception:

> [Section] 17-5-30 is the legislature's *unequivocal expression* of its desire
> that evidence seized by means of a warrant that is not supported by

---

[1]     Section 626.21 is similar to the then-Federal Rule of Criminal Procedure 41(e). In a decision the year before *Mapp*, the U.S. Supreme Court explained the purpose of Rule 41(e): "The restrictions upon searches and seizures were obviously designed for protection against official invasion of privacy and the security of property. . . . The exclusion in federal trials of evidence otherwise competent but gathered by federal officials in violation of the Fourth Amendment is a means for making effective the protection of privacy." *Jones v. United States*, 362 U.S. 257, 261 (1960).

[2]     Rule 41(e)'s language regarding the exclusionary rule was deleted in 1989, in response to the Court's adoption of the good-faith exception in *United States v. Leon*, 468 U.S. 897 (1984). *See* Fed. R. Crim. P. 41(e) advisory committee's notes to 1989 amendment ("[T]he exclusionary provision is deleted, and the scope of the exclusionary rule is reserved for judicial decisions.").

[3]     Like the Minnesota statute, the Georgia statute was passed in the aftermath of *Mapp* and tracks the language of the then-Fed. R. Crim. P. 41(e).

probable cause be suppressed. The legislature enacted this statute to protect against governmental disregard for constitutionally-protected rights . . . . In light of the unequivocal language of [the statute], infusion of the *Leon* good-faith exception into the statute would be tantamount to judicial legislation. We decline to enter the realm of the legislature . . . .

*Id*. at 428-29 (emphasis added) (footnote omitted). Minnesota has the same "unequivocal" language in section 626.21.

The North Carolina Supreme Court, too, rejected the judicially created good-faith exception on the ground that no such exception was found in the 1973 statutory codification of its longstanding exclusionary rule. *See State v. Carter*, 370 S.E.2d 553, 562 (N.C. 1988). As the court explained:

It must be remembered that it is not only the rights of this criminal defendant that are at issue, but the rights of all persons under our state constitution. . . . If a good faith exception is to be applied to this public policy, let it be done by the legislature, the body politic responsible for the formation and expression of matters of public policy.

*Id.*

The majority's effort to read section 626.21 as purely procedural is unavailing. Of course, section 626.21 uses the phrase "[i]f the motion is granted." Obviously, a motion to suppress evidence will be granted only "if" the person aggrieved demonstrates what the statute requires: "an unlawful search and seizure." Minn. Stat. § 626.21. In this case, the movant met that burden, showing that the warrantless seizure of her blood was unconstitutional. This triggered the statute's remedy: suppression. *Compare State v. Smith*, 367 N.W.2d 497, 504-05 (Minn. 1985) (declining to suppress the fruits of a search by warrant when the address for the search was obtained by an assumed "technical

violation" of the Minnesota Government Data Practices Act that "did not violate any of defendant's constitutional rights").[4]

Similarly unavailing is the majority's effort to limit the suppression remedy to only the blood that was unconstitutionally seized, but not to the tests on that very blood. This effort is anticipated by section 626.21, which requires the suppression and return of not just the unlawfully seized property, but also prevents the "use, as evidence, of anything so obtained." A blood test is *obtained* from, and is the *use of*, the unlawfully seized blood. The majority's hair-splitting conflicts with longstanding black-letter constitutional law. When an unlawful search and seizure violates Article I, Section 10 of the Minnesota Constitution, both the property and the fruits of the search must be suppressed. *See In re Welfare of B.R.K.*, 658 N.W.2d 565, 579 (Minn. 2003) (violation of the Fourth Amendment and Minnesota Constitution Article I, Section 10, requires that "the fruits of the [warrantless] entry and search must be suppressed"); *State v. Paul*, 548 N.W.2d 260, 264 (Minn. 1996) ("If a warrantless entry is made without probable cause and exigent circumstances, its fruit must be suppressed."); *State v. King*, 279 Minn. 225, 228, 156 N.W.2d 742, 744 (1968) (physical evidence must be suppressed as the product of statements unconstitutionally obtained, citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

---

[4]   Thus, the text of section 626.21 easily defeats the majority's criticism that it does not contain a "substantive guideline." It contains a substantive command that if the search and seizure was unlawful but not a mere "technical violation which did not subvert the basic purpose of the statute," *Smith*, 367 N.W.2d at 504, a remedy is required.

By regulating law enforcement and granting the victim of an unlawful search and seizure a timely and practical remedy, section 626.21 makes concrete the guarantees of the Minnesota Constitution in Article I, Sections 8 and 10. If section 626.21 is to be amended a half-century after its enactment, thereby undermining Minnesotans' privacy rights, that task is for the branch of government that passed it, the Legislature, not for this court. By eliminating Minnesotans' statutory remedy for a constitutional violation, the majority inappropriately engages in judicial legislation.

The unlawfully seized evidence must be suppressed. With these observations, I respectfully dissent and join the dissent of Justice Page.

PAGE, Justice (dissenting).

I join in the dissent of Justice Lillehaug.